CONNECTICUT ASSOCIATION OF NOT-FOR-PROFIT
PROVIDERS FOR THE AGING *v.* DEPARTMENT
OF SOCIAL SERVICES ET AL.
(SC 15735)

Callahan, C. J., and Borden, Berdon, Norcott and Palmer, Js.

Argued January 21—officially released March 31, 1998

*Jeffrey R. Babbin*, with whom was *Alan G. Schwartz*, for the appellant (plaintiff).

*Arnold I. Menchel*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Jennifer Bard*, assistant attorney general, for the appellees (defendants).

*Opinion*

CALLAHAN, C. J. This administrative appeal arises from a petition brought by the plaintiff, the Connecticut Association of Not-For-Profit Providers for the Aging, seeking a declaratory ruling with respect to the legality of a practice employed by the named defendant, the department of social services (department),[1] in its rate setting capacity for medicaid reimbursement. The principal issue is whether the department may use the *lesser* of the statutorily mandated fair rent value or the actual property costs in setting the rate payable to not-for-profit nursing facilities for expenditures eligible for medicaid reimbursement. The plaintiff contends that

---

[1] Joyce Thomas, the commissioner of the department, was also listed as a defendant.

neither the plain text of General Statutes § 17b-340 (f),[2] the governing statute, nor its legislative history permits the practice of using the lesser value in setting medicaid reimbursement rates for not-for-profit facilities.[3] The plaintiff also seeks compensation for reasonable attorney's fees and costs incurred in pursuing this litigation

[2] General Statutes § 17b-340 (f) provides in relevant part: "For the fiscal year ending June 30, 1992, the rates paid by or for persons aided or cared for by the state or any town in this state to facilities for room, board and services specified in licensing regulations issued by the licensing agency, except intermediate care facilities for the mentally retarded and homes for the aged, shall be based on the cost year ending September 30, 1989. For the fiscal years ending June 30, 1993, and June 30, 1994, such rates shall be based on the cost year ending September 30, 1990. Notwithstanding the provisions of section 17b-344, *such rates shall be determined by the Commissioner of Social Services in accordance with this section and the regulations of Connecticut state agencies promulgated by the commissioner and in effect on April 1, 1991, except that:*

"*(1) Allowable costs shall be divided into the following five cost components: Direct costs,* which shall include salaries for nursing personnel, related fringe benefits and nursing pool costs; *indirect costs,* which shall include professional fees, dietary expenses, housekeeping expenses, laundry expenses, supplies related to patient care, salaries for indirect care personnel and related fringe benefits; *fair rent, which shall be defined in accordance with subsection (f) of section 17-311-52 of the regulations* of Connecticut state agencies; *capital-related costs,* which shall include property taxes, insurance expenses, equipment leases and equipment depreciation; and *administrative and general costs,* which shall include maintenance and operation of plant expenses, salaries for administrative and maintenance personnel and related fringe benefits. . . .

"(3) For the fiscal year ending June 30, 1992, *per diem maximum allowable costs for each cost component shall be as follows:* For direct costs, the maximum shall be equal to one hundred forty per cent of the median allowable cost of that peer grouping; for indirect costs, the maximum shall be equal to one hundred thirty per cent of the state-wide median allowable cost; *for fair rent, the amount shall be calculated utilizing the amount approved by the Office of Health Care Access pursuant to section 19a-638;* for capital-related costs, there shall be no maximum; and for administrative and general costs, the maximum shall be equal to one hundred twenty-five per cent of the state-wide median allowable cost. . . . *Costs in excess of the maximum amounts established under this subsection shall not be recognized as allowable costs . . . .*" (Emphasis added.)

[3] The plaintiff also argues that the practice is in violation of federal medicaid law. Because we resolve this case in favor of the plaintiff on its state law claim, we need not address the federal law question.

because, it alleges, the department has acted without substantial justification. The department maintains that its practice of using the lesser value for not-for-profit facilities is mandated by the language of the statute as informed by the legislative purpose in enacting the legislation. It further argues that even if the practice is determined to be impermissible, its interpretation of the law was reasonable and, therefore, the plaintiff is not entitled to attorney's fees and costs. Additionally, the department contends that if this court concludes that the practice is impermissible, the appropriate remedy is a remand for reconsideration by the department, not a directed judgment. We agree with the plaintiff that the department is not permitted to use the lesser value methodology. We decline to conclude, however, that the plaintiff is entitled to attorney's fees or that the defendant is entitled to a remand rather than a directed judgment.

The following relevant facts are undisputed. The plaintiff is a trade association whose members are not-for-profit nursing facilities providing care for the elderly and compensated by federal medicaid funds. Federal medicaid funds are distributed to the states, and the department is the state agency vested with authority to regulate and manage the state's medicaid program, which is established by statute and approved by the federal government.[4] See 42 U.S.C. § 1396 et seq.; General Statutes § 17b-260.[5] Specifically, the department

[4] Federal statutes require each state to adopt a reimbursement methodology and to submit an annual plan based on that methodology to the federal government for approval. 42 U.S.C. §§ 1396, 1396b and 1396c. Connecticut's reimbursement methodology for nursing facilities is governed by § 17b-340 (f), formerly § 17-314, and is submitted and approved as the state medicaid plan.

[5] General Statutes § 17b-260 provides: "The Commissioner of Social Services is authorized to take advantage of the medical assistance programs provided in Title XIX, entitled 'Grants to States for Medical Assistance Programs', contained in the Social Security Amendments of 1965 and may administer the same in accordance with the requirements provided therein,

has authority to set, pursuant to a statutory methodology, the annual rates paid to nursing facilities, including members of the plaintiff association.

In 1991, the General Assembly enacted Public Acts, Spec. Sess., June, 1991, No. 91-8, § 22, now codified as § 17b-340 (f), which established a mandatory methodology for setting the rates payable to nursing facilities providing services to patients eligible for medicaid. The statute essentially retained the existing rate setting structure, but introduced several significant modifications that comprehensively and exclusively govern the reimbursement methodology for nursing facilities.[6] The relevant portion of that methodology is as follows. The statute creates five categories of allowable costs as the basis for setting the annual rate payable to each facility. General Statutes § 17b-340 (f) (1). Those categories are: direct costs, indirect costs, "fair rent," capital costs, and administrative and general costs. The statute establishes a preset maximum dollar amount for the direct, indirect, and administrative and general cost categories.[7] General Statutes § 17b-340 (f) (3). There is no cap for capital costs, and the only limitation applicable to fair rent is the determination of the original valuation

including the waiving, with respect to the amount paid for medical care, of provisions concerning recovery from beneficiaries or their estates, charges and recoveries against legally liable relatives, and liens against property of beneficiaries."

[6] Prior to 1991, the department had regulations in force to establish the method of reimbursement. The new act, in its opening paragraph, incorporated those regulations by reference by requiring that those regulations, existing prior to April 1, 1991, continue in force. Public Acts, Spec. Sess., June, 1991, No. 91-8, § 22. The new act then proceeded, however, to establish fourteen subdivisions that are exceptions to those regulations. Accordingly, § 17b-340 (f) controls the rate setting methodology, and resort to prior regulations is appropriate only where the statute is silent.

[7] The cap is based on "the median allowable cost of that peer grouping . . . ." General Statutes § 17b-340 (f) (3). Accordingly, a specific facility may not be reimbursed for more than the average amount that all facilities in the state spend on the relevant cost.

of the facility in its certificate of need as approved by the appropriate state agency.[8] General Statutes § 17b-340 (f) (3); Regs., Conn. State Agencies § 17-311-52 (f).[9] From these five categories, the total allowable costs are determined and serve as the basis of the yearly reimbursement rate payable to a covered nursing facility.

The dispute in this case involves the determination of the proper figure to be used in the fair rent cost category. The statute requires that fair rent "shall be defined in accordance with subsection (f) of section 17-311-52 of the regulations of Connecticut state agencies . . . ."[10] General Statutes § 17b-340 (f) (1). That regulation requires the department to calculate a figure,

---

[8] The responsibility for approving the certificate of need has been modified in recent years. At the time Public Acts, Spec. Sess., June, 1991, No. 91-8 was adopted, approval was the responsibility of the Commission on Hospitals and Health Care. It is that commission that is referred to throughout the legislative history of § 17b-340 (f). That commission was subsequently renamed and is known as the Office of Health Care Access. General Statutes § 19a-638; Public Acts 1995, No. 95-257, § 39. The authority to approve certificates of need was transferred to the department in 1993. General Statutes §§ 17b-352 through 17b-354; Public Acts 1993, No. 93-262. The language of § 17b-340 (f) still refers to the agency responsible for approving the certificate of need as the Office of Health Care Access.

[9] Section 17b-340 (f) (3) refers to the maximum allowed for fair rent only as "the amount [to] be calculated utilizing the amount approved by the Office of Health Care Access pursuant to section 19a-638 . . . ." That allows the fair rent calculation to be whatever it is determined to be pursuant to § 17-311-52 (f) of the regulations, without limitation other than what the office of health care access determines as its base value over its useful life in granting the facility's certificate of need.

[10] Section 17-311-52 (f) of the Regulations of Connecticut State Agencies provides in relevant part: "(1) The fair rental value allowance shall be in lieu of interest on mortgages, other property financing costs, depreciation on buildings and non-movable equipment and rental charges . . . . The allowance shall be computed in the same manner whether the facility is owned or leased . . . and whether the facility is operated by an individual owner, partners, or a corporation.

"(2) The fair rental value allowance consists of rental allowance of the use of land, buildings and non-movable equipment related to patient care. . . .

"(b) . . . . *The fair rental value allowance is calculated to yield a constant amount each year in lieu of interest and depreciation costs,* such

known as fair rent,[11] and to use that figure in this cost category rather than using the actual property costs[12] in determining the total allowable costs. The purpose is to equalize the amount of payments each year and thus compensate the facility over the term of its useful life without fluctuations in the yearly amount. Regs., Conn. State Agencies § 17-311-52 (f) (2). The use of the fair rent figure introduces a degree of certainty as to that cost, which otherwise might vary significantly from year to year.

The gravamen of the plaintiff's complaint is that the department, pursuant to an informal practice, has modified this statutorily mandated reimbursement methodology with respect to not-for-profit nursing facilities.

---

allowance for the use of real property other than land shall be determined by amortizing the base value of such property over its remaining useful life and applying a rate of return on the unamortized base value. . . .

"For nonprofit (voluntary and governmental) facilities, constructed or acquired after the effective date of this amendment to the regulations, the applicable rate of return utilized in calculating the fair rental value shall be the same rate of return as that used for proprietary facilities. . . ." (Emphasis added.)

[11] Fair rent is calculated in lieu of mortgage interest, other financing costs and depreciation related to certain property, including land, buildings and nonmovable equipment. It is calculated only once, at the time the facility begins operation, and is derived from the "base value" as determined in the facility's certificate of need, which is approved and issued by the appropriate state agency. See General Statutes § 17b-340 (f) (3) and footnote 7 of this opinion. Once that figure is determined, it is inserted into the formula each year to determine the allowable costs along with the other four cost categories. The formula for calculating fair rent, along with the appropriate figures to be used in that formula, is established by regulation. The fair rent value is calculated by multiplying the base value of the land by a specified rate of return and by amortizing the base value of the building and nonmovable equipment over the useful life of the property and applying a specified rate of return. Regs., Conn. State Agencies § 17-311-52 (f) (2).

[12] Actual property costs, as that term is used throughout, includes the interest on mortgages, other financing costs and depreciation costs attributable to the land, the building and the nonmovable equipment of the facility. It does not include other property-related expenses, such as the mortgage principal, property taxes and insurance, because those costs are included in other categories.

Pursuant to this practice, the department uses the *lesser* of the predetermined fair rent figure or the actual property costs for not-for-profit nursing facilities (the lesser value methodology).[13] Thus, in years where the calculated fair rent figure is greater than actual property costs, the department uses the actual property costs. In years when the actual property costs exceed the fair rent figure, the department uses the fair rent figure. The department applies this methodology only to not-for-profit nursing facilities.

The plaintiff petitioned the department for a declaratory ruling with respect to the legality of this practice. The hearing officer appointed by the department concluded that the department's use of the lesser value methodology was an acceptable interpretation of the statute and denied the plaintiff's petition. The plaintiff appealed from the department's decision to the trial court pursuant to General Statutes §§ 4-183 and 4-176.[14] The trial court, concluding that it owed deference to

---

[13] The department's submission of the state medicaid plan for 1995 includes a statement that "[t]here is no capital cost (e.g. property taxes, insurance) maximum and property costs are recognized within limits of approved Certificate of Need amounts through a fair rental value allowance system which is in lieu of interest and depreciation costs except not-for-profit facilities are allowed the lower of the fair rental value amount or actual interest and depreciation costs." The department does not dispute that this is an accurate statement of its practice.

[14] General Statutes § 4-183 (a) provides: "A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. The filing of a petition for reconsideration is not a prerequisite to the filing of such an appeal."

General Statutes § 4-166 (3) provides in relevant part: " 'Final decision' means . . . (B) a declaratory ruling issued by an agency pursuant to section 4-176 . . . ."

General Statutes § 4-176 (a) provides: "Any person may petition an agency, or an agency may on its own motion initiate a proceeding, for a declaratory ruling as to the validity of any regulation, or the applicability to specified circumstances of a provision of the general statutes, a regulation, or a final decision on a matter within the jurisdiction of the agency."

the hearing officer's decision and that the department's interpretation was not contrary to law, dismissed the plaintiff's appeal. The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023, now Practice Book (1998 Rev.) § 65-1, and General Statutes § 51-199 (c). We reverse the judgment of the trial court.

The department first argues that the trial court was without subject matter jurisdiction to hear this appeal because the plaintiff lacks standing. The department's argument relies, in part, on the fact that some members of the plaintiff association have signed agreements whereby they agreed to accept a reduction in reimbursement for property related expenditures in exchange for the opportunity to refinance their debt at a reduced rate with the Connecticut Health and Education Financing Authority. In this respect, facilities that are party to those agreements have relinquished their right to reimbursement under the statutory methodology. Although this fact is not disputed, it is not persuasive.

This court has recognized representational standing in accordance with the holdings of the United States Supreme Court. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. [*Hunt* v. *Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)] . . . ." (Citations omitted; internal quotation marks omitted.) *Connecticut Assn. of Health Care Facilities, Inc.* v. *Worrell*, 199 Conn. 609, 616, 508 A.2d 743 (1986). We went on to note that the propriety of accepting "[r]epresentational standing depends in substantial

measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. . . . Associational standing is particularly appropriate . . . where the relief sought is . . . a declaratory judgment [pursuant to General Statutes § 4-175] . . . ." (Internal quotation marks omitted.) Id. We subsequently concluded that the *Worrell* rationale was not limited solely to declaratory judgment actions brought directly to the Superior Court pursuant to § 4-175, and that it is to be applied with equal force to any administrative appeal brought pursuant to § 4-183. *Connecticut Business & Industry Assn.* v. *Commission on Hospitals & Health Care*, 218 Conn. 335, 344, 589 A.2d 356 (1991). In so concluding, we specifically acknowledged its applicability to an association seeking a declaratory ruling pursuant to § 4-176. Id., citing *Connecticut State Medical Society* v. *Board of Examiners in Podiatry*, 203 Conn. 295, 304–305, 524 A.2d 636 (1987).

The plaintiff meets the three-pronged test recognized in *Worrell*. There can be no doubt in this case that the members of the plaintiff association, at least those who had not signed special agreements, could have brought an action for a declaratory ruling with respect to the legality of the department's lesser value methodology as applied to not-for-profit facilities. The practice affects members of the association, all of which are not-for-profit facilities. The interests that the plaintiff seeks to protect with this action are, therefore, germane to the interests of the association members. Finally, because this action seeks only a general declaration concerning the legality of the department's practice, it is unnecessary for any individual member to be a party to this action. Furthermore, "[w]e have implicitly rejected the

notion that aggrievement must be universal among the membership of an association before it may have representative standing." *Timber Trails Corp.* v. *Planning & Zoning Commission,* 222 Conn. 380, 395, 610 A.2d 620 (1992).

Additionally, the department alleges that the plaintiff failed to exhaust all of its administrative remedies. It asserts that if any one of the plaintiff's members wishes to challenge the department's practice, that member may bring its own action for a rate rehearing. This argument is unpersuasive. First, the plaintiff is not seeking reimbursement for past rate inadequacies on behalf of its members. The relief sought by the plaintiff is prospective in nature.[15] The fact that an alternative remedy may exist in favor of the members of the association[16] in no way implicates the exhaustion doctrine with respect to the association itself. The plaintiff, as an association, has only one remedy, a petition for a declaratory ruling. Any other action probably would require that the individual members be parties to the action, and representational standing would not be permitted under the third prong of the *Worrell* test. *Connecticut Assn. of Health Care Facilities, Inc.* v. *Worrell,* supra, 199 Conn. 617.

Were we to conclude, as the department suggests, that the availability of an alternative remedy to the individual members of an association is a bar to the association's standing, we would obviate the holding

[15] The department's assertion that the plaintiff is improperly seeking prospective relief also is unpersuasive. According to the department, a medicaid provider has no vested interest in future reimbursement. The cases cited for this proposition are directed at the issue of a property interest for purposes of due process analysis. They are inapposite to the case at hand. The plaintiff does not seek a declaration that its members are entitled to a certain sum of money in future years. It seeks only a declaration that the current practice of the department is a violation of § 17b-340 (f).

[16] In this case, the individual members do have two remedies, the right to request a rate rehearing pursuant to General Statutes § 17b-238, and a right to petition for a declaratory ruling.

in *Worrell.* Associations would be left with standing in name only, since virtually every association will have a member that could seek its own remedy. The plaintiff, therefore, has standing to bring this petition and to pursue its appeal from the final decision of the department denying that petition.[17] See General Statutes §§ 4-176, 4-183 (a) and 4-166 (3). We turn, therefore, to the plaintiff's substantive claims.

The standard of review of an agency decision is well established. "Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . *Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion.* . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the *courts, and not administrative agencies,* to expound and apply governing principles of law." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.,* 243 Conn. 635, 642–43, 708 A.2d 202 (1998).

The trial court, quoting from *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control,* 219 Conn.

---

[17] We equally are unpersuaded by the department's argument that the plaintiff lacks standing because it lacks aggrievement. Because the department allegedly has never yet paid less than the actual costs of a facility, the department asserts that none of the members of the plaintiff association has been harmed. This argument is without merit. If the statute authorizes a facility to receive a certain sum, payment of less than that sum aggrieves the facility. The plaintiff certainly has standing to seek a declaratory ruling to determine whether the statute, in fact, authorizes a certain sum. See General Statutes § 4-176 (a).

51, 57–58, 591 A.2d 1231 (1991), incorrectly concluded that its " 'ultimate duty is only to decide whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion.' " We recently reaffirmed the inadequacy of this deferential standard in cases presenting pure questions of law. *Burinskas* v. *Dept. of Social Services*, 240 Conn. 141, 147, 691 A.2d 586 (1997). In *Burinskas*, we noted that where "the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . that construction constitutes a question of law for which deference is not warranted." (Citations omitted; internal quotation marks omitted.) Id.[18] Although application of a deferential standard of review by the trial court was improper, our review of questions of law is plenary and, therefore, we address the substantive merits of the plaintiff's appeal. *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.*, supra, 243 Conn. 644.

I

The plaintiff asserts that neither the plain language of § 17b-340 (f) nor its legislative history supports the

[18] The department's attempt to argue that its practice is entitled to deference as a time-tested agency interpretation is unavailing. The department admits that it has employed its practice only since 1991 and apparently had not made a public statement of this practice prior to 1995, at which point the plaintiff filed its petition for a declaratory ruling. Four years hardly constitutes a "time-tested" agency interpretation. Nor are we persuaded that we should conclude that there has been legislative acquiescence in this interpretation. See *Jolly, Inc.* v. *Zoning Board of Appeals*, 237 Conn. 184, 200–201, 676 A.2d 831 (1996). We cannot conclude that the legislature was even aware of this interpretation when it has been manifested only as an informal practice and never has been the subject of formal rule-making procedures or an adjudicatory interpretation by the department or a court. Moreover, the legislature has made no substantive change to the relevant portions of § 17b-340 (f) since the department's practice has become the subject of litigation.

use of the lesser value methodology or differential treatment of facilities based on profit status.[19] The department asserts that its use of the lesser value methodology is not only permissible, it is mandated by the language of the statute when that language is construed in light of the legislative purpose. The department concedes that it never employed this practice prior to the 1991 enactment of § 17b-340 (f), and that the practice would not have been permitted under the prior statute and regulations. Resolution of this issue, therefore, requires that we interpret § 17b-340 (f).

In matters of statutory interpretation, we are guided by well established principles, paramount among which is the principle that "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Spears*, 234 Conn. 78, 86–87, 662 A.2d 80, cert. denied, 516 U.S. 1009, 116 S. Ct. 565, 133 L. Ed. 2d 490 (1995).

Neither the text of § 17b-340 (f) (1), describing the five categories of allowable costs, nor the regulations defining fair rent incorporated therein, authorizes the

---

[19] In addition to arguing that the department's practice violates § 17b-340 (f), the plaintiff also argued before the department and the trial court that the action violates the equal protection clauses of both the state and federal constitutions and that the practice is an abuse of discretion because the department has adopted a rule of general applicability without use of the formal rule-making procedure required by General Statutes § 4-174. Although the parties make passing reference to these arguments, they did not adequately raise these issues on appeal. Moreover, in light of our conclusion regarding the lack of statutory authority for the practice, it is unnecessary for us to address those other claims.

department to employ the lesser value methodology. Furthermore, there is no indication that not-for-profit facilities and for-profit facilities are to be accorded diverse treatment with respect to the application of fair rent valuation.[20] Despite the plain language of § 17b-340 (f) (1) and the applicable regulations, as well as the absence of any legislative history to support its practice of applying the lesser value methodology to not-for-profit facilities, the department claims to find support for its practice in the legislative purpose behind this legislation.

The statutory language relied on by the department to suggest that legislative purpose appears in § 17b-340 (f) (3), which establishes a statutory cap on three of the five cost categories and mandates that costs in excess of those caps shall not be reimbursed. That subdivision concludes by providing that "[c]osts in excess of the maximum amounts established under this subsection shall not be recognized as allowable costs . . . ." General Statutes § 17b-340 (f) (3). It is this single sentence that the department claims plainly mandates use of the lesser value methodology it currently employs. The

---

[20] The only authorization for differential treatment based on profit status appears in § 17-311-52 (m) of the Regulations of Connecticut State Agencies. Section 17-311-52 (m) of the regulations provides: "For non-profit facilities, the *aggregate total allowable costs shall not exceed the costs submitted* by the provider plus efficiency adjustments, less unallowable costs exclusive of those not required under applicable federal regulations, e.g., inflation and efficiency limitations, salary controls, and the effect of the fair rental value system." (Emphasis added.) This regulation was incorporated by reference in the opening paragraph of § 17b-340 (f) and is thus part of the statutory scheme. The department agrees, however, that this regulation does not authorize the disparate treatment with respect to the application of fair rent. This regulation becomes relevant only after the total allowable costs have been determined on the basis of the five cost categories, including fair rent, according to the statutory methodology. After the calculation of total allowable costs is made, § 17-311-52 (m) requires the department to assess a not-for-profit facility's total actual costs and ensure that the allowable costs, in toto, do not exceed actual costs, in toto.

department argues that the legislative purpose suggested by this language is the legislature's intent to save money by curbing costs of medicaid reimbursement for nursing facilities by setting reimbursement maximums.

The department argues that if a not-for-profit facility is credited with its fair rent value in a given year, and that value exceeds its actual property costs for that year, this effectively would allow the facility to recoup costs in excess of the statutory maximum in other categories. It reaches this conclusion because not-for-profit facilities are not allowed to make a profit. Any excess in the fair rent category cannot, therefore, be attributed to profit, as with a for-profit facility. Consequently, the excess may only be attributed to recoupment of costs in the capped categories. Because, in the department's view, the statute *demands* that the capped cost categories not be exceeded, the department is *forced* to use the lesser value methodology to prevent the not-for-profit facilities from recouping these forbidden costs through the excess of the fair rent allowance.

This rationale is at once suspect because the lesser value methodology, as articulated by the department, would be used even in situations where the facility has not exceeded the statutory maximum in the capped categories. Moreover, the underlying premise of the department's argument is based on a semantic distinction divorced from economic reality. It assumes that the for-profit facility may attribute the excess in the fair rent category to profit. It may not do so, however, until all of its actual costs have been reimbursed. Consequently, a for-profit facility is able to exceed the statutory maximums in the same manner as a not-for-profit facility before it actually realizes a profit.

The department's argument that its ad hoc methodology is necessary to prevent a not-for-profit facility from having "profit" in a given year is unpersuasive. The

legislature has predetermined that a facility's annual property costs are not its actual costs in any one year, but are a figure known as fair rent as determined from the original valuation of the property in the facility's certificate of need. By legislation, a facility's annual property cost is always equal to the predetermined fair rent figure and, consequently, there is never an excess in that category and there is nothing to carry over into the capped categories.[21] Moreover, the legislature already has ensured that not-for-profit facilities cannot make an overall profit by precluding the department from paying a rate based on total *allowable* costs that exceed total *actual* costs by incorporating into the statutory scheme § 17-311-52 (m) of the Regulations of Connecticut State Agencies.

Section 17b-340 (f) and regulation § 17-311-52 (f), incorporated therein by reference, unambiguously require the department to use fair rent in lieu of actual property costs. Interpreting the statute and regulation as the department advocates would require that we read the statute to include a special exception to the fair rent provision applicable exclusively to not-for-profit facilities that is not in the statute or discernible from the legislative history. " 'We will not torture the words or sentence structure of a statute . . . to import an ambiguity where the ordinary meaning of the language leaves no room for it.' *Board of Education* v. *State Employees Retirement Commission*, 210 Conn. 531, 543, 556 A.2d 572 (1989)." *State* v. *Genotti*, 220 Conn. 796, 809, 601 A.2d 1013 (1992). "[I]n the absence of ambiguity, courts cannot read into statutes, by construction, provisions which are not clearly stated

---

[21] An alternative way of viewing this is that the legislature allows the facility to use its receipts from fair rent that are in excess of actual property costs, which occurs in the latter years of the facility's useful life, and apply them retroactively to the earlier years in which the fair rent was inadequate to compensate the actual property costs for those years.

. . . ." (Citation omitted; internal quotation marks omitted.) *Carothers* v. *Capozziello*, 215 Conn. 82, 129, 574 A.2d 1268 (1990). The department's interpretation imports ambiguity where none is apparent, and engrafts language onto the statute that appears nowhere in the text.

Our conclusion, furthermore, is supported by the legislative history of § 17b-340 (f). The legislative history makes clear that there shall be no preset maximum on the annual determination of fair rent other than the initial base rate valuation determined in the facility's certificate of need. The legislature clearly understood that *"[t]here is going to be no cap on capital related expenses, and fair rent will also be uncapped* except to the extent that the capital, or the fair rent was approved by the hospital cost commission when the facility was approved. So basically, *the industry will not be capped at all in terms of capital related expenditures, which includes fair rent* and all those expenses I alluded to." (Emphasis added.) 34 H.R. Proc., Pt. 37, 1991 June Spec. Sess., p. 1864, remarks of Representative Joseph D. Courtney. Use of the actual property costs instead of the fair rent figure would effectively cap fair rent when the legislature clearly intended otherwise.

The policy reasons for not capping fair rent or other capital costs were stated clearly by Senator Kenneth L. Przybysz. When asked by Senator Philip S. Robertson "exactly what fair rent the floors are and what the maximums are as far as fair rent is concerned," Senator Przybysz responded, "[t]here are no maximums, Senator. A fair rent will be passed through and it will be defined as it is in the Connecticut regulations . . . ." 34 S. Proc., Pt. 14, 1991 June Spec. Sess., p. 503.[22] He

---

[22] Both Senator Przybysz and Representative Courtney were cosponsors of the bills in their respective chambers. "We pay particular attention to statements of the legislators who sponsored the bill." *Doe* v. *Marselle*, 236 Conn. 845, 852 n.9, 675 A.2d 835 (1996).

explained the rationale for this legislative choice by noting that "if a nursing home had committed capital that was approved by the commission on hospitals and health care through the certificate of need process that that should be reflected in the rates that are reimbursed . . . . [W]e decided that capital costs should be passed through. . . . [F]air rent as defined in Connecticut regulations will also be allowed to be passed through . . . ." Id., pp. 503–504, remarks of Senator Przybysz. Capital related expenses include both the capital cost category and the fair rent cost category. 34 H.R. Proc., supra, p. 1864. The necessary control over those costs would be accomplished through the certificate of need approval process, not the cost containment mechanism of preset cost caps.

Finally, nowhere in the legislative history is there a reference to disparate treatment for not-for-profit facilities, nor is there any indication that a different methodology would be appropriate. To the contrary, Senator Przybysz noted that "[s]etting nursing home rates is a very complicated and complex procedure. What we lay out in this bill are some new procedures to set rates for *all homes*, but on an individual basis, using the new procedures, one of which is the cost center, cost component [i.e., the five categories of costs] that we discussed previously." (Emphasis added.) 34 S. Proc., supra, p. 502.

The department's argument, that we should look beyond the plain words of the statute and the legislative history to consider what it claims to be the overriding legislative purpose, does not lead to the conclusion that the legislature intended the department to apply the lesser value methodology to not-for-profit facilities. It is undisputed that the legislature intended to save medicaid funds by cutting reimbursements to nursing facilities. See 34 H.R. Proc., supra, pp. 1855–58; 34 S. Proc., supra, pp. 448, 453, 495. The legislative history makes

clear, however, that it does so by capping three specific areas of cost. Section 17b-340 (f) was not directed toward addressing the concerns raised by controlling capital related expenditures, which include fair rent. This is obvious from the statements of the sponsors of the bills in their descriptions of the act and its purpose.

The legislature was acting upon the recommendation of the Nursing Home Task Force. 34 H.R. Proc., supra, p. 1855. That task force identified two factors that were responsible for explosion of costs in nursing care reimbursement. Id. The first was disproportionately high expenditures by facilities related to direct, indirect, and administrative and general costs, as compared to other states and even among facilities within this state. Id., pp. 1857–58. The task force recommended remedying this by setting caps for those costs and by providing incentives to facilities to come in below those limits. Id., p. 1858. The second problem related to the dramatic increase in the number of beds. Id. The task force recommended resolving that problem, first, by a two year moratorium on approval of new beds and, second, by "recommend[ing] that our whole process of approving [certificates of need] should undergo a thorough review so that the Hospital Commission is not operating in isolation from the other two agencies of government that regulate long-term care . . . ." Id., pp. 1858–59, remarks of Representative Courtney. The legislature also directed that the commission on hospitals and health care should meet with the other related agencies to "develop a consistent policy to make sure that the kind of growth and cost of this program will be restrained in the future. . . . At the conclusion of the two year period, the [three agencies] will return to us, hopefully with a new policy to make sure that the approval of new beds [in] the state of Connecticut in the future will be done in a way that is cognizant of the impact that it's going to have on both state medicaid

dollars and also private pay dollars." Id., p. 1859, remarks of Representative Courtney. Clearly, there was an anticipation of future action that would address the certificate of need approval process to ensure cost containment in cost categories relating to capital expenditures, i.e., the uncapped fair rent and capital cost categories. From this legislative history, it is apparent that the legislature intended that concerns regarding the containment of fair rent costs were to be controlled in the certificate of need approval process, and not by the department by way of a modified methodology. Thus, although the legislative purpose was cost containment, the legislative intent in achieving that goal does not comport with the department's use of the lesser value methodology.

Additionally, the use of the lesser value methodology is contrary to the legislative policy to equalize payments and to provide for full reimbursement over the useful life of the property.[23] This policy provides the benefit of certainty in knowing the yearly figure payable for this allowable cost, and it ensures that a facility will be properly reimbursed over its useful life. The department's lesser value methodology undermines both of these purposes. There is no longer either certainty in the amount of payments, or a guarantee of full reimbursement. Here, the department impermissibly has disregarded the legislative policy choice to set rates based on the lesser of the fair rent value or the actual property costs. We conclude, therefore, that the department's use of the lesser value methodology is not permitted under § 17b-340 (f), which requires the exclusive use of fair rent in determining the allowable costs of all nursing facilities.

---

[23] Section 17-311-52 (f) (2) of the Regulations of Connecticut State Agencies explicitly states that purpose. See footnote 9 of this opinion. When the legislature enacted § 17b-340 (f) (1), it specifically adopted that regulation into the statutory scheme. The regulation is, therefore, a statement of legislative policy.

## II

The department argues that if we conclude that its practice is impermissible, the proper remedy is to remand this case to the hearing officer for reconsideration of the impact of certain evidence. It contends that there was evidence presented to the trial court that was not part of the administrative record. It further maintains that the evidence admitted in the trial court tends to establish facts contrary to the factual conclusions of the hearing officer and that the trial court impermissibly relied on this evidence.[24]

The evidence at issue is the 1992 cost report and the department's rate computation for 1993–94, for St. Joseph Manor, Inc., a member of the plaintiff association. The report and computation indicate that the department applied the fair rent figure rather than actual property costs when the fair rent figure was the lesser figure. The department argues that the evidence regarding St. Joseph Manor, Inc., tends to demonstrate that a not-for-profit facility received less than its actual costs, which is contrary to an argument by the department that it always paid at least actual property costs to not-for-profit facilities and to a factual conclusion reached by the hearing officer that such facilities never received less than their actual costs. The department suggests, therefore, that we must remand this case to the department for a resolution of this factual discrepancy that was never presented to the hearing officer. We are unpersuaded.

The department concedes that the hearing officer took official notice of all of the cost reports and rate computations for each of the plaintiff's members. Those

---

[24] The trial court admitted this evidence over the objection of the department because it concluded that the hearing officer had taken official notice of the documents in question and that they were, therefore, part of the administrative record before the court.

documents were, therefore, a part of the administrative record irrespective of whether the hearing officer actually reviewed them, and the trial court properly could have considered them in reviewing the record. Moreover, because we concluded in the first part of this opinion that § 17b-340 (f) requires the exclusive use of fair rent and does not permit the use of actual property costs, it is irrelevant whether the department has ever paid less than actual property cost. The only relevant question is whether it ever used a figure other than fair rent.[25] The department admits that it does use actual property costs rather than fair rent when the actual property cost is the lesser figure. Moreover, the state medicaid plan for 1995, which was also part of the administrative record, clearly states that the department uses the lesser of the actual property costs or fair rent for not-for-profit facilities.

The resolution of this case rests upon the construction of a statute, over which our review is plenary, to determine if the department may use the lesser value methodology. The only relevant factual issue, i.e., whether it is the department's practice to apply the actual property costs to not-for-profit facilities if it is less than the fair rent figure, was not disputed either here or at the hearing before the department. Moreover, the fact that it is the department's practice to apply the lesser figure to not-for-profit facilities is supported adequately by the record without reference to the evidence regarding St. Joseph Manor, Inc. The question of

[25] The department argues that not-for-profit facilities are not harmed because they always receive their actual property costs. Consequently, by the end of the facility's useful life, it will have received the same amount that it would have received if the department had paid the equalized fair rent payments. Evidence that the department uses the fair rent value if it is less than the actual property costs would undermine this argument. This aspect of the department's argument, however, did not inform our determination of the statutory requirement that mandates exclusive use of the fair rent figure. Evidence relating to this issue did not, therefore, affect our interpretation of the statute.

whether the department used the lesser value in its calculations is not pertinent to the resolution of the legal issue because the department is required to use the fair rent figure at all times. Remand of this case to the department for further proceedings is, therefore, unnecessary.

### III

Having concluded that the department's practice was impermissible, we must address the plaintiff's final claim seeking reimbursement for reasonable attorney's fees and costs pursuant to General Statutes § 4-184a. Section 4-184a (b) authorizes a court to grant attorney's fees if it "determines that the action of the agency was undertaken without any substantial justification." We recently have concluded that " 'substantial justification' . . . connotes reasonableness or a reasonable basis in law or fact." *Burinskas* v. *Dept. of Social Services,* supra, 240 Conn. 156. Thus, we have construed § 4-184a (b) as requiring an action that is "entirely unreasonable or without any reasonable basis in law or fact." Id. Although we conclude that the department's practice is contrary to the relevant legislation, it does not follow necessarily that its action was unreasonable or without any basis in law or fact. The practice was based on the department's good faith interpretation of the legislative mandate to control costs. It was not entirely unreasonable for the department to conclude that the law might permit such measures. Consequently, we will not award the plaintiff attorney's fees or costs.

The judgment is reversed and the case is remanded to the trial court with direction to sustain the plaintiff's appeal.

In this opinion the other justices concurred.