[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Memorandum of Decision
In this case, the plaintiffs seek primarily to enjoin the state's fall, 2000 program for trapping of fur-bearing animals on state-controlled lands. On September 27, 2000, the court issued an ex parte temporary injunction, pending a full adversary hearing, enjoining the defendant Commissioner of Environmental Protection ("Commissioner") from accepting bids for and awarding permits to trap, which were otherwise scheduled to be awarded beginning October 2, 2000. The plaintiffs have applied to continue the temporary injunction on the merits. The Commissioner has moved to dismiss and seeks to vacate the ex parte injunction. The court heard arguments and received evidence on October 2 and 3, 2000. For the reasons stated below, the court denies the motion to dismiss but vacates the ex parte injunction and denies the application to renew it.
BACKGROUND
The plaintiffs focus on certain "Conditions of Permit" attached by the Commissioner to a recently issued "Invitation to Bid for a Permit to Trap on State-Owned Land." The plaintiffs main concern is that, if they or their members obtain permits, they will be required to "harvest," that is kill, fur-bearing animals. The plaintiffs seek instead to use what they claim are nonlethal and noninjurious trapping methods or simply to obtain the permits and not trap at all.
The complaint raises essentially three causes of action. In the first count, the plaintiffs allege that the current permit conditions violate a 1999 settlement reached between the same parties concerning whether the Commissioner could require proof that a bidder has harvested furbearing animals. Paragraphs 1-17 of the Second Count claim that the permit conditions violate General Statutes § 22a-16, a provision of the Connecticut Environmental Protection Act ("CEPA"), in that the conditions purportedly result in the unreasonable destruction of natural resources. CT Page 12337 Paragraphs 18 and 19 of the Second Count make the separate claim that the permit conditions are unauthorized by law and constitute invalid rule-making.
THE MOTION TO DISMISS
 1. Justiciability and Ripeness
Both the complaint and the motion to dismiss focus on paragraphs 11 and 13 of the Conditions of Permit.[1] Paragraph 11 provides as follows:
 The Commissioner may at any time remove from the unit(s) specified in the permit any nuisance fur-bearer, provided that before doing so the Commissioner will offer the permittee the opportunity to trap such nuisance fur-bearer during the term of the permit. If the permittee accepts such opportunity, he or she shall, at the commissioner's request, submit to the Department's Wildlife Division carcasses, or parts thereof, to verify whether the permittee in fact has trapped any such fur-bearer. Without first obtaining the Commissioner's specific authorization, the permittee shall not relocate any fur-bearer from one unit to another.
The Commissioner argues that there is no justiciable controversy concerning paragraph 11 because it does not require anyone to harvest any fur-bearing animal. See Hallas v. Windsor, 212 Conn. 338, 347, 562 A.2d 499
(1989). The Commissioner claims instead that paragraph 11 simply reserves the Commissioner's authority to remove any nuisance fur-bearer from the permit while at the same time giving any permittee the opportunity, if he chooses to exercise it, to kill any such nuisance animal.
The Commissioner's interpretation appears valid. However, to assess whether this permit condition, even as the Commissioner interprets it, violates the 1999 settlement, results in the unreasonable destruction of natural resources, or constitutes invalid rule-making, as the plaintiffs claim, this court must delve into the merits of the case. Even though the merits appear to weigh decidedly in favor of the Commissioner, the court cannot say that there is no "actual controversy between or among the parties in dispute," or that the "interests of the parties [are not] adverse." Id. Accordingly, the court finds that the controversy concerning paragraph 11 is justiciable.
Paragraph 13 of the permit conditions provides as follows:
CT Page 12338 The Commissioner may condition a permit by requiring that the permittee (A) harvest a minimum, or harvest no more than a specified maximum, of one or more species, or (B) submit to the Department's Wildlife Division the carcasses, or part thereof, of harvested animals in order to allow verification of the harvest or biological examination.
The Commissioner argues that any dispute concerning whether this paragraph improperly requires harvesting of animals is not ripe because it merely authorizes the Commissioner to require harvesting in the future, which he has not yet done. The court heard and credits testimony from Edward Parker, the Chief of the Department of Environmental Protection s Bureau of Natural Resources, that the Commissioner has included a similar provision in permits for at least the last five years and has never invoked the harvesting requirement. Parker added that, in all likelihood, if the Commissioner did require harvesting in the future, that condition would be included in the permit and would afford the permittee thirty days to fulfill the harvesting requirement. On the other hand, Parker acknowledged that there is at least some possibility that the Commissioner could require harvesting in the future on an emergency basis, without affording a party a meaningful opportunity to challenge it in court.
Because of this possibility, the court finds that the controversy concerning paragraph 13 is ripe for decision now. Further, although it appears that paragraph 13 does not currently violate the 1999 agreement, pose any new danger of unreasonable destruction of natural resources, or result in any new or invalid rule, the plaintiffs allege to the contrary in their complaint. Thus, whether the court should in fact interpret paragraph 13 as posing only a possible risk of future harm to the plaintiffs, as the Commissioner contends, is a question intimately tied to the merits of this case. Accordingly, the court finds the controversy concerning paragraph 13 to be ripe and justiciable.
2. Standing
The Commissioner agrees that the plaintiffs, as parties to the settlement agreement, have standing to claim a violation of it, and that the plaintiffs have standing under the broad standing provisions of CEPA. See Manchester Environmental Coalition v. Stockton, 184 Conn. 51,57, 441 A.2d 68 (1981). The Commissioner argues, however, that the plaintiffs lack standing to raise the claim of invalid rule-making. The core of his argument is that the individual plaintiff, Arlene Corey, and the organizational plaintiffs have never trapped on state lands and therefore would not be harmed by any conditions that the Commissioner has CT Page 12339 imposed or may impose on trapping in those lands.
The ultimate test for standing is whether a plaintiff has made "a colorable claim of direct injury he has suffered or is likely to suffer." (Internal quotation marks omitted). Unisys Corporation v. Department ofLabor, 220 Conn. 689, 693, 600 A.2d 1019 (1991). An organization, such as the plaintiffs Friends of Animals and Animal Rights Fund, has standing if its members would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. See Association ofNot-for-Profit Providers for the Aging v. Department of Social Services,244 Conn. 378, 386, 709 A.2d 1116 (1998).
It is true that there is no evidence that Corey and the members of the plaintiff organizations have trapped, either with lethal or nonlethal methods, on state lands in the past. Further, the testimony revealed that the members have little intention of trapping on state lands this year. The possible injury to the plaintiffs, however, is not limited to depriving them of the opportunity to engage in nonlethal trapping. In their complaint, the plaintiffs claim to be a group of people who "practice non-injurious and/or nonlethal methods of trapping or who havenot engaged in injurious and/or lethal trapping," or "who practice wildlife management without injurious or lethal result." Complaint, Second Count, ¶¶ 16, 20 (emphasis added). These allegations suggest, and the testimony confirmed, that some members bid for permits not to trap, but rather as a form of passive wildlife management to prevent others from obtaining the same permits and using them to conduct lethal trapping. Although the Commissioner presumably does not intend to issue permits to people who do not wish to trap, the plaintiffs' activity nonetheless appears to be legal.
The testimony established that the individual plaintiff, Arlene Corey, and the members of the plaintiff organizations have obtained permits to trap on state-controlled lands in the past and, for the most part, have submitted bids for new permits this year.[2] These permittees are united in their opposition to lethal trapping. Regardless of whether they intend to engage in nonlethal trapping, they arguably would be injured if they obtained permits and, contrary to their beliefs, were required to employ lethal trapping methods. Based on this testimony, the court finds that the plaintiffs have standing. Accordingly, the court denies the motion to dismiss.
THE APPLICATION FOR A TEMPORARY INJUNCTION
In order to obtain a temporary injunction, the plaintiffs must show CT Page 12340 that there is (1) no adequate remedy at law, (2) irreparable injury, (3) probable success on the merits, and (4) a balance of equities favoring an injunction. See Waterbury Teachers Association v. Freedom of InformationCommission, 230 Conn. 441, 446, 645 A.2d 978 (1994); Fleet National Bankv. Burke, 45 Conn. Sup. 566, 570, 727 A.2d 823 (1999). An evaluation of these factors tips decidedly in favor of the Commissioner.
1. Adequate Remedy at Law
The existence of an adequate remedy at law usually refers to the availability of money damages as a remedy. See Loveridge v. PendletonWoolen Mills, Inc., 788 F.2d 914, 917-18 (2d Cir. 1986); Lac du FlambeauBand of Lake Superior Chippewa Indians v. Stop Treaty Abuse Wisconsin,759 F. Sup. 1339, 1352 (W.D. Wis. 1991), affd in part and reversed in part on other grounds, 991 F.2d 1249 (7th Cir. 1993). In the present case, money damages would not be an adequate remedy for any violation with the possible exception of the claim that the Commissioner violated the settlement agreement. For that claim, the plaintiffs, depending on possible sovereign immunity defenses, might have the ability to sue the Commissioner for breach of contract.
The Commissioner argues that there is an adequate remedy at law for all claims because, in the event that the Commissioner invokes a harvesting requirement and plaintiff Corey or any member of the plaintiff organizations (hereinafter collectively referred to as "the plaintiffs") failed to comply, the plaintiffs have the right under the Uniform Administrative Procedure Act (UAPA), General Statutes §§ 4-176 et seq., to administrative and superior court review of any action the Commissioner might take regarding their permits. The Commissioner represents that, in any superior court review, the plaintiff would have "the opportunity to raise all her claims."
Although it is uncertain whether the Commissioner will ever impose a harvesting requirement, it is also uncertain whether, in the event of a harvesting requirement, the Commissioner would move to revoke one or more of the plaintiffs' permits for noncompliance, particularly because that plaintiff would likely raise as defenses all the legal arguments now being raised. In short, it is difficult to say that the opportunity to raise these legal claims as defenses to a possible revocation of their permit qualifies as an "adequate remedy at law" when the plaintiffs have no control over whether they will have that opportunity. It is thus not clear that there is an adequate remedy at law.
2. Irreparable Injury
The plaintiffs do not seek to enjoin all lethal trapping of fur-bearing CT Page 12341 animals in Connecticut.[3] The plaintiffs seek only to enjoin the Commissioner from including paragraphs 11 and 13 in the Conditions of Permit applicable to trapping on state lands. of these two conditions, only paragraph 13 would, if invoked, require a permittee to harvest animals.[4] That being the case, the plaintiffs cannot prove irreparable harm.
Initially, it is dispositive of this element that the Commissioner has not invoked the minimum harvest requirement in paragraph 13. Based on the past history, he may never do so. Because the sole condition that poses a claimed harm to the plaintiffs has never occurred, it follows ineluctably that no harm of any sort has occurred.
Even if the Commissioner were to invoke the harvesting requirement of paragraph 13, no irreparable injury would take place. First, the plaintiffs themselves, or other similarly-minded trappers, can remedy any harm by simply deciding not to trap on state lands. Losing the opportunity to engage in nonlethal trapping of fur-bearing animals on state lands may disappoint the plaintiffs, but there is, after all, no clear legal right to engage in nonlethal trapping on state land.[5]
Thus, invocation of the harvesting requirement in paragraph 13 would not violate any individual rights.
Nor would it irreparably harm any other legally cognizable interest. While the harvesting of a fur-bearer is obviously an irreversible loss of an animal, the legislature has not forbidden all killing of animals. Instead, the legislature, in CEPA, has only required the "protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction. . . ." General Statutes § 22a-16 (emphasis added).
The plaintiffs presented no evidence that a minimum harvest requirement for trapping fur-bearers on state lands would result in the "unreasonable . . . destruction" of "natural resources" (which include wildlife). On the other hand, the Commissioner presented persuasive evidence to the contrary. For one thing, in recent years, the number of fur-bearing animals harvested on state lands represents a relatively small percentage of the total harvest (which includes private lands) and is very low in relation to the total population in each species. Thus the impact of any harvesting requirement on state lands would be modest, particularly if the minimum harvest is low. Second, harvesting serves a number of important public policy objectives. Among them are the protection of persons and their property, including agricultural property, from disease and damage, the protection of other animals, including endangered species, the protection of other natural resources such as wetlands, the provision of pelts and carcasses for economic uses such as human and CT Page 12342 animal food production, and the furtherance of a variety of recreational and cultural interests. Third, the Commissioner has employed a variety of alternatives in managing the fur-bearing animal population. See Gardinerv. Conservation Commission, 222 Conn. 98, 109, 608 A.2d 672 (1992). At times, there are no reasonable alternatives to lethal trapping. For example, simply relocating excessive or diseased raccoons from one part of our small state to another does not appear to make much sense and would not likely meet with approval from nearby residents. In other situations, the Commissioner has advocated tolerance of fur-bearers or other nonlethal alternatives. Thus, the evidence unequivocally shows that a harvesting requirement for trapping of fur-bearing animals on state lands does not result in the "unreasonable, destruction" of wildlife. The plaintiffs have thus failed to prove any irreparable injury.
3. Probable Success on the Merits
The preceding discussion establishes that there is no likelihood of success for the plaintiffs' CEPA claim. The same is true of the other two claims in the complaint.
The plaintiffs first argue that the Commissioner violated a 1999 settlement agreement between the parties. The agreement resolved a lawsuit filed by the same plaintiffs challenging a provision in the Commissioner's 1999 Invitation to Bid that had required, as a condition of eligibility, that each bidder submit "proof that the bidder has harvested fur-bearing animals during at least four trapping seasons. . . ." In the agreement, the Commissioner withdrew the 1999 invitation to bid and stipulated that the Department of Environmental Protection would not require "as a condition of eligibility or as a condition of participation" in a "contract, for a permit to trap [fur-bearing animals] on state land[s]" that "the bidder supply proof that the bidder has harvested fur-bearing animals unless and until regulations are passed or a statute enacted that allows such a condition."
The short answer to the plaintiffs' claim that the Commissioner has violated this settlement agreement is simply that neither paragraphs 11 nor 13, which the plaintiffs now attack, require any "proof that the bidder has harvested fur-bearing animals." Indeed, paragraphs 11 and 13, or nearly identical counterparts, were in the 1999 Invitation to Bid but were not challenged by the plaintiffs at that time. It is certainly hard to see how these paragraphs could now violate an agreement that supposedly addressed all of the plaintiffs' concerns about the 1999 bid when the plaintiffs had no legal concerns about those same paragraphs at the time of the agreement.
The plaintiffs' final claim is that the Commissioner should have CT Page 12343 promulgated paragraphs 11 and 13 as agency regulations pursuant to General Statutes § 4-168 of the UAPA. The court sees no merit to this claim. "[A]dministrative agencies must necessarily interpret statutes which are made for their guidance and they may do so without reference to regulations." (Internal citations omitted). Sweetman v. State ElectionsEnforcement Commission, 249 Conn. 296, 317, 732 A.2d 144 (1999). The Commissioner's authority to destroy undesirable or diseased wildlife, to provide for the protection and management of wildlife, and to manage state forests and parks derives directly from General Statutes §§ 22a-5, 26-3, and other statutes.[6] The Commissioner should not have to go through the formalities of rule-making to announce every new variable of environmental and wildlife management that arises before every new hunting or trapping season. For all these reasons, the court concludes that there is no likelihood of success on the merits.
4. Balance of the Equities
The balance of the equities involved in considering a temporary injunction against the Commissioner weighs heavily against issuing an injunction. An injunction essentially shuts down the fall, 2000 fur-bearing trapping season on state lands with all its attendant benefits, described above, to the ecology, the economy, and the recreational and cultural interests of Connecticut citizens. In contrast, vacating the current ex parte injunction poses none of the alleged harm to the plaintiffs, because at this time the Commissioner has not invoked a minimum harvest requirement. Thus the decision that minimizes, if not eliminates, harm to both sides is to vacate the current injunction.
CONCLUSION
For the foregoing reasons, the motion to dismiss is denied, the ex parte injunction is vacated, and the application for a temporary injunction is denied.
It is so ordered.
Carl J. Schuman Judge, Superior Court