# JOHN P. BURKE, COMMISSIONER OF BANKING, ET AL. *v.* FLEET NATIONAL BANK ET AL. (SC 16157)

Borden, Berdon, Norcott, Katz, Palmer, Callahan and Lavery, Js.

Argued September 29—officially released December 20, 1999*

---

* December 20, 1999, the date that this opinion was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Richard Blumenthal*, attorney general, with whom were *Gregory T. D'Auria* and *William J. Prensky*, assistant attorneys general, for the appellants (plaintiffs).

*Daniel L. FitzMaurice* and *Donald E. Frechette*, with whom were *James S. Rollins* and *Michael Shea*, for the appellees (defendants).

*Victoria L. Veltri* filed a brief for Greater Hartford Legal Assistance as amicus curiae.

*Ronald W. Zdrojeski, Cynthia L. Amara*, pro hac vice, and *Loretta Smith*, pro hac vice, filed a brief for the New England Legal Foundation as amicus curiae.

*Opinion*

BORDEN, J. The sole issue in this reservation is whether General Statutes § 36a-156[1] prohibits a bank[2]

---

[1] General Statutes § 36a-156 provides: "Availability of machines, devices and terminals for use by other banks and credit unions. (a) One or more banks, Connecticut credit unions or federal credit unions which have established a satellite device or point of sale terminal shall make the satellite device or point of sale terminal available on a nondiscriminatory basis for use by any other bank, Connecticut credit union or federal credit union, upon payment by each such other bank or credit union of a reasonably proportionate share of all acquisition, installation and operating costs of the satellite device or point of sale terminal. The satellite device or point of sale terminal shall identify with equal prominence all of the banks, credit unions or network systems which use the satellite device or point of sale terminal.

"(b) Any bank, Connecticut credit union or federal credit union which has established an automated teller machine which is not a satellite device may, in its discretion, permit any other bank, Connecticut credit union or federal credit union to use such automated teller machine, provided, (1) if such permission is granted to any other bank, Connecticut credit union or

from charging a convenience fee to a nondepositor who uses that bank's automated teller machine (ATM). We answer the reservation in the negative.

The stipulation reveals the following facts. The plaintiffs are John P. Burke, the banking commissioner of the state of Connecticut (commissioner), and the state of Connecticut. The defendants, Fleet National Bank (Fleet), First Union National Bank (First Union), and BankBoston, N.A. (BankBoston), are national banks that have established and operate ATMs in Connecticut. An ATM is defined under Connecticut law as "a stationary or mobile unattended device, including a satellite device but excluding a point of sale terminal, at which banking transactions, including, but not limited to, deposits, withdrawals, advances, payments or transfers, may be conducted . . . ." General Statutes § 36a-2 (3). A point of sale terminal is defined as "a device located in a commercial establishment at which sales transactions can be charged directly to the buyer's deposit, loan or credit account, but at which deposit transactions cannot be conducted . . . ." General Statutes § 36a-2 (45).

In addition to servicing its own depositors, an establishing bank[3] may, through its participation in an ATM network, process transactions for nondepositors who hold ATM cards issued by other banks, also called card-issuing banks, which are members of the ATM network.

federal credit union, the automated teller machine is made available on a nondiscriminatory basis for use by any other bank, Connecticut credit union or federal credit union, upon payment of reasonably proportionate costs as described under subsection (a) of this section, and (2) such use is otherwise in accordance with subsection (a) of this section."

[2] Although § 36a-156 refers to the conduct of banks, state credit unions and federal credit unions, the reservation before this court is limited to banks. We, therefore, refer throughout the opinion solely to banks, but assume nonetheless that our conclusion as to the meaning of § 36a-156 applies equally to state and federal credit unions.

[3] An establishing bank is a bank that maintains an ATM as part of an ATM network of which the establishing bank is a member.

There are three types of charges associated with transactions processed through an ATM network. First, an interchange fee is a fee that an establishing bank receives from another member bank in the network, whose depositor uses the establishing bank's ATM. Second, the ATM depositor fee "is a fee charged by a bank to its own depositor for use of an ATM operated by either the depositor's bank or another bank. Third, the ATM nondepositor fee, also commonly referred to as a convenience fee or surcharge, is a fee charged by an establishing bank to a nondepositor who uses that bank's ATM. At issue in this appeal is the permissibility under state law of imposing the ATM nondepositor fee.[4]

The issue raised by this appeal originated with an interpretive letter issued by the commissioner in September, 1995, which declared that § 36a-156 implicitly prohibits ATM nondepositor fees. In January, 1997, Fleet brought an action against the commissioner and the state banking department in the United States District Court for the District of Connecticut, claiming that § 36a-156 does not prohibit ATM nondepositor fees, or, in the alternative, that federal law preempts any such prohibition. The District Court granted summary judgment for Fleet, holding that § 36a-156 does not prohibit ATM nondepositor fees. *Fleet Bank, National Assn.* v. *Burke,* 23 F. Sup. 2d 196, 203 (D. Conn. 1998). On appeal from that judgment, however, the United States Court of Appeals for the Second Circuit held that the District Court lacked subject matter jurisdiction. *Fleet Bank, National Assn.* v. *Burke,* 160 F.3d 883, 893 (2d Cir. 1998), cert. denied, 527 U.S. 1004, 119 S. Ct. 2340, 144 L. Ed. 2d 237 (1999). Accordingly, the Second Circuit vacated the judgment and directed that the action be dismissed. Id.

---

[4] The parties dispute whether federal law specifically permits the imposition of such fees. That issue is not before us, however, because the question reserved for our consideration is limited to whether *state* law permits ATM nondepositor fees.

Fleet and First Union immediately brought separate actions against the commissioner, which since have been consolidated in the United States District Court for the District of Connecticut, claiming various violations of 42 U.S.C. § 1983. See *First Union National Bank* v. *Burke*, United States District Court, Docket No. 3:98CV2171 (JBA) (D. Conn. April 7, 1999). Thereafter, the commissioner, invoking General Statutes §§ 36a-50[5]

[5] General Statutes § 36a-50 provides: "Enforcement action. Notice and hearing. Civil penalty. Injunction, restraining order and writ. Restitution. Costs. (a) (1) Whenever the commissioner finds as the result of an investigation that any person has violated any provision of the general statutes within the jurisdiction of the commissioner, or any regulation, rule or order adopted or issued thereunder, the commissioner may send a notice to such person by registered or certified mail, return receipt requested. The notice shall be deemed received by the person on the earlier of the date of actual receipt or seven days after mailing. Any such notice shall include: (A) A statement of the time, place, and nature of the hearing; (B) a statement of the legal authority and jurisdiction under which the hearing is to be held; (C) a reference to the particular sections of the general statutes, regulations, rules or orders alleged to have been violated; (D) a short and plain statement of the matters asserted; (E) the maximum penalty that may be imposed for such violation; and (F) a statement indicating that such person may file a written request for a hearing on the matters asserted within fourteen days of receipt of the notice.

"(2) If a hearing is requested within the time specified in the notice, the commissioner shall hold a hearing upon the matters asserted in the notice unless such person fails to appear at the hearing. After the hearing, if the commissioner finds that the person has violated any such provision, regulation, rule or order, the commissioner may, in the commissioner's discretion and in addition to any other remedy authorized by law, order that a civil penalty not exceeding seven thousand five hundred dollars per violation be imposed upon such person. If such person does not request a hearing within the time specified in the notice or fails to appear at the hearing, the commissioner may, as the facts require, order that a civil penalty not exceeding seven thousand five hundred dollars per violation be imposed upon such person.

"(3) Each action undertaken by the commissioner under this subsection shall be in accordance with the provisions of chapter 54.

"(b) Whenever it appears to the commissioner that any such person has violated, is violating or is about to violate any such provision, regulation, rule or order, the commissioner may, in the commissioner's discretion and in addition to any other remedy authorized by law: (1) Bring an action in the superior court for the judicial district of Hartford to enjoin the acts or practices and to enforce compliance with any such provision, regulation,

## and 36a-52,[6] issued a temporary ex parte order and notice

rule or order. Upon a proper showing, a permanent or temporary injunction, restraining order or writ of mandamus shall be granted and a receiver or conservator may be appointed for such person or such person's assets. The court shall not require the commissioner to post a bond; (2) seek a court order imposing a penalty not to exceed seven thousand five hundred dollars per violation against any such person found to have violated any order issued by the commissioner; or (3) apply to the superior court for the judicial district of Hartford for an order of restitution whereby such person shall be ordered to make restitution of any sums shown by the commissioner to have been obtained by such person in violation of any such provision, regulation, rule or order, plus interest at the rate set forth in section 37-3a. Such restitution shall, at the option of the court, be payable to the receiver or conservator appointed pursuant to this subsection, or directly to the person whose assets were obtained in violation of any such provision, regulation, rule or order. Whenever the commissioner prevails in any action brought under this subsection, the court may allow to the state its costs.

"(c) The provisions of this section shall not apply to chapters 672a, 672b and 672c."

[6] General Statutes § 36a-52 provides: "Cease and desist orders. (a) Whenever it appears to the commissioner that any person has violated, is violating or is about to violate any provision of the general statutes within the jurisdiction of the commissioner, or any regulation, rule, or order adopted or issued thereunder, the commissioner may send a notice to such person by registered or certified mail, return receipt requested. The notice shall be deemed received by the person on the earlier of the date of actual receipt, or seven days after mailing. Any such notice shall include: (1) A statement of the time, place, and nature of the hearing; (2) a statement of the legal authority and jurisdiction under which the hearing is to be held; (3) a reference to the particular sections of the general statutes, regulations, rules or orders alleged to have been violated; (4) a short and plain statement of the matters asserted; and (5) a statement indicating that such person may file a written request for a hearing on the matters asserted within fourteen days of receipt of the notice. If a hearing is requested within the time specified in the notice, the commissioner shall hold a hearing upon the matters asserted in the notice, unless the person fails to appear at the hearing. After the hearing, the commissioner shall determine whether an order to cease and desist should be issued against the person named in the notice. If the person does not request a hearing within the time specified in the notice or fails to appear at the hearing, the commissioner shall issue an order to cease and desist against the person. No such order shall be issued except in accordance with the provisions of chapter 54.

"(b) If the commissioner finds that the public welfare requires immediate action, the commissioner may incorporate a finding to that effect in the notice sent in accordance with subsection (a) of this section and issue a temporary order requiring the person to cease and desist from the activity

of hearing, claiming that Fleet, First Union and Bank-Boston were in violation of § 36a-156 by imposing ATM nondepositor fees, and ordering those banks to cease and desist from that practice. The banks requested a hearing in accordance with § 36a-50. The hearing was postponed while the District Court considered requests for a preliminary injunction filed by the banks and the United States Office of the Comptroller of the Currency (Comptroller), during which time the banks agreed not to impose ATM nondepositor fees. The commissioner did not proceed with the hearing with respect to Bank-Boston.

After receiving the cease and desist order, Fleet and First Union filed applications for an injunction in the Superior Court pursuant to § 36a-52 (d) to set aside or suspend the enforcement of the order. After a hearing, the trial court, *Teller, J.*, denied the banks' applications for an injunction. *Fleet National Bank* v. *Burke*, 45 Conn. Sup. 566, 580, 727 A.2d 823 (1998).

Shortly thereafter, the Comptroller intervened in the consolidated action seeking to restrain the administrative hearing by virtue of a temporary restraining order and a preliminary injunction against the commissioner

which constitutes such alleged violation. Such temporary order shall become effective on receipt and, unless set aside or modified by a court, shall remain in effect until the effective date of a permanent order or dismissal of the matters asserted in the notice.

"(c) In the event that a party requests a continuance of the hearing and such request is granted by the presiding officer, the commissioner, in the commissioner's discretion, shall thereupon issue a temporary cease and desist order effective upon issuance. The issuance of such a temporary cease and desist order does not require a finding that the public welfare requires immediate action.

"(d) Within five days of receipt of a temporary order issued pursuant to this section, any person named therein may apply to the superior court for the judicial district of Hartford for an injunction setting aside, limiting or suspending the enforcement, operation or effectiveness of such order pending final determination by the commissioner, and the court shall have jurisdiction to issue such injunction."

and the banking department. The District Court granted the Comptroller's request for a preliminary injunction, and prohibited the commissioner from continuing with the pending administrative proceedings against Fleet and First Union until final disposition of the merits of the Comptroller's complaint.[7] *First Union National Bank* v. *Burke,* supra, United States District Court, Docket No. 3:98CV2171 (JBA). That decision expressly did not preclude either the Comptroller from initiating its own administrative proceeding pursuant to § 36a-156, or the commissioner from seeking enforcement through the state courts. Id.

The commissioner then brought this action in the Superior Court, pursuant to his authority under § 36a-50 (b), to enforce his interpretation of § 36a-156, as described in his September, 1995 interpretive letter. At the request of all parties, and to expedite the resolution of this litigation, the trial court, *Hon. Jerry Wagner,* judge trial referee, approved the joint stipulation of facts and reserved the following question for the advice of the Appellate Court pursuant to General Statutes § 52-235[8] and Practice Book § 73-1:[9] "Does General Stat-

[7] Although the commissioner and the banking department appealed from that judgment, that appeal, according to the stipulation, currently is "deactivated."

[8] General Statutes § 52-235 provides: "(a) The Superior Court, or any judge of the court, with the consent of all parties of record, may reserve questions of law for the advice of the Supreme Court or Appellate Court in all cases in which an appeal could lawfully have been taken to said court had judgment been rendered therein.

"(b) The court or judge making the reservation shall, in the judgment, decree or decision made or rendered in such cases, conform to the advice of the Supreme Court or the Appellate Court."

[9] Practice Book § 73-1 provides: "(a) Any reservation shall be taken to the supreme court or to the appellate court from those cases in which an appeal could have been taken directly to the supreme court, or to the appellate court, respectively, had judgment been rendered. Reservations in cases where the proper court for the appeal cannot be determined prior to judgment shall be taken directly to the supreme court.

"(b) All questions presented for advice shall be specific and shall be phrased so as to require a Yes or No answer.

utes § 36a-156 prohibit a bank which has established an automated teller machine from charging a fee to a nondepositor who uses the bank's machine?" We transferred the reservation from the Appellate Court to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2. We answer the reservation in the negative.

We first address the applicable standard of review. "Ordinarily, this court affords deference to the construction of a statute applied by the administrative

"(c) Before any question shall be reserved by any court, counsel shall file in that court a stipulation which shall clearly and fully state the question or questions upon which advice is desired; that their present determination by the appellate court having jurisdiction would be in the interest of simplicity, directness and economy in judicial action, the grounds for such allegation being particularly stated; that the answers to the questions will determine, or are reasonably certain to enter into the final determination of the case; and that the parties request that the questions be reserved for the advice of the appellate court having jurisdiction. The stipulation shall also designate the specific pleadings in the trial court case file which are necessary for the presentation of the question or questions sought to be reserved and shall state the undisputed facts which are essential for determination of the question or questions sought to be reserved. With the stipulation the parties shall file a joint docketing statement in the format specified in Section 63-4 (a) (4) for regular appeals.

"(d) Upon the ordering of a reservation by the superior court, the clerk of the trial court shall send notice of the reservation to the appellate clerk and to all parties of record. The date of issuance of this notice shall be deemed the filing date of the appeal for purposes of the brief filing deadlines of Section 67-3. No entry fee shall be paid to the superior court and no costs shall be taxed in favor of any party. With the notice of reservation, the clerk of the trial court shall send to the appellate clerk two copies each of the stipulation, its accompanying joint docketing statement, the superior court's order of reservation, and the docket sheet (DS1) listing the counsel for all parties.

"(e) The court will not entertain a reservation for its advice upon questions of law arising in any action unless the question or questions presented are such as are, in the opinion of the court, reasonably certain to enter into the decision of the case, and it appears that their present determination would be in the interest of simplicity, directness and economy of judicial action.

"(f) The advice of the appellate court on a reservation may be reviewed by the supreme court only upon the granting of certification as provided in chapter 84."

agency empowered by law to carry out the statute's purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts." (Internal quotation marks omitted.) *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services*, 244 Conn. 378, 389, 709 A.2d 1116 (1998); *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.*, 243 Conn. 635, 642, 708 A.2d 202 (1998); *Dept. of Administrative Services* v. *Employees' Review Board*, 226 Conn. 670, 678, 628 A.2d 957 (1993). "Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services*, supra, 389; *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.*, supra, 642; *Dept. of Administrative Services* v. *Employees' Review Board*, supra, 678. "Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference." (Internal quotation marks omitted.) *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services*, supra, 389; *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.*, supra, 642; *Dept. of Administrative Services* v. *Employees' Review Board*, supra, 678–79. Whether § 36a-156 implicitly prohibits ATM nondepositor fees had not been subject to judicial consideration prior to the commissioner's interpretive letter,[10] and is purely a question of law concerning the

---

[10] We recognize that two courts interpreted the meaning of § 36a-156 after the commissioner's letter: the District Court in *Fleet Bank, National Assn.* v. *Burke*, supra, 23 F. Sup. 2d 203, a decision later vacated for lack of subject matter jurisdiction in *Fleet Bank, National Assn.* v. *Burke*, supra, 160 F.3d 893; and the Superior Court's denial of the banks' request for an injunction in *Fleet National Bank* v. *Burke*, supra, 45 Conn. Sup. 580, a decision made in the context of temporary injunction applications, and not a determination on the merits. Of course, neither decision is binding on this court.

interpretation of the relevant statutory provisions. We therefore give no special deference to the commissioner's interpretation of § 36a-156.

The question reserved for this court presents a question of statutory interpretation. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Id.; *Carpenteri-Waddington, Inc.* v. *Commissioner of Revenue Services*, 231 Conn. 355, 362, 650 A.2d 147 (1994); *United Illuminating Co.* v. *Groppo*, 220 Conn. 749, 755–56, 601 A.2d 1005 (1992)." (Internal quotation marks omitted.) *Bortner* v. *Woodbridge*, 250 Conn. 241, 258–59, 736 A.2d 104 (1999).

The plaintiffs argue that § 36a-156 prohibits the imposition of ATM nondepositor fees because it imposes only an interchange fee and thus implicitly disallows the imposition of any other fees. The plaintiffs expressly contend, however, that § 36a-156 does not prohibit depositor fees. The defendants argue that § 36a-156 does not prohibit such fees because the statute does not govern the fees that may be charged to customers, whether depositors or nondepositors. We agree with the defendants.

We conclude that § 36a-156 governs the establishment of ATMs by banks, the conditions under which *other* banks must be afforded access to those ATMs,

and the financial terms, as between the establishing bank and the other banks, of that access. We further conclude that § 36a-156 does not, either expressly or by implication, govern the imposition of customer fees, whether depositor fees or nondepositor fees.

We start with the statutory language at issue. Section 36a-156 provides: "(a) One or more banks, Connecticut credit unions or federal credit unions which have established a satellite device or point of sale terminal shall make the satellite device or point of sale terminal available *on a nondiscriminatory basis* for use by any other bank, Connecticut credit union or federal credit union, *upon payment* by each such other bank or credit union *of a reasonably proportionate share of all acquisition, installation and operating costs* of the satellite device or point of sale terminal. The satellite device or point of sale terminal shall identify with equal prominence all of the banks, credit unions or network systems which use the satellite device or point of sale terminal. (b) Any bank, Connecticut credit union or federal credit union which has established an automated teller machine which is not a satellite device may, in its discretion, permit any other bank, Connecticut credit union or federal credit union to use such automated teller machine, provided, (1) if such permission is granted to any other bank, Connecticut credit union or federal credit union, the automated teller machine is made available *on a nondiscriminatory basis* for use by any other bank, Connecticut credit union or federal credit union, *upon payment of reasonably proportionate costs* as described under subsection (a) of this section, and (2) such use is otherwise in accordance with subsection (a) of this section." (Emphasis added.)

We first recognize the differences among the three types of banking devices covered by the statute—specifically, satellite device, point of sale terminal and automated teller machine which is not a satellite device

(hereinafter nonsatellite device). A satellite device is defined as "an automated teller machine which is not part of an office of the bank, Connecticut credit union or federal credit union which has established such machine . . . ." General Statutes § 36a-2 (51). In common parlance, a satellite device is an ATM machine located not at a bank, but elsewhere, such as in a supermarket or an office building lobby. A point of sale terminal is defined as "a device located in a commercial establishment at which sales transactions can be charged directly to the buyer's deposit, loan or credit account, but at which deposit transactions cannot be conducted . . . ." General Statutes § 36a-2 (45). A point of sale terminal is not an ATM machine, but rather a device by which a customer may make a purchase at a commercial establishment. Point of sale terminals are commonly located in supermarket checkout lines and pharmacies. Finally, a nonsatellite device is an ATM machine located in a branch of the establishing bank— e.g., a Fleet ATM machine located at a Fleet branch.

Although the title of a statute is not determinative of its meaning, we often have looked to a statute's title as some evidence of that meaning. See, e.g., *State* v. *Dash*, 242 Conn. 143, 147, 698 A.2d 297 (1997); *Anderson* v. *Ludgin*, 175 Conn. 545, 554, 400 A.2d 712 (1978). The title of § 36a-156, "Availability of machines, devices and terminals for use by other banks and credit unions," is indicative of the statute's limited purpose. It suggests that the statute governs the manner in which the establishing bank shall make the banking devices available to other banks. It makes no mention of how the establishing bank shall treat customers, whether depositors or nondepositors.

Although the language of the statute refers to the three types of banking devices described previously, the statute treats satellite devices and point of sale terminals differently from nonsatellite devices. Subsec-

tion (a) of the statute applies only to satellite devices and point of sale terminals. Subsection (a) of § 36a-156 provides in relevant part: "One or more banks . . . which have established a satellite device or point of sale terminal *shall make* the satellite device or point of sale terminal available on a nondiscriminatory basis . . . ." (Emphasis added.) This provision mandates that banks that have established satellite devices or point of sale terminals make the device available on a nondiscriminatory basis for use by any other bank, so long as the other bank pays the interchange fee. To illustrate, if bank A establishes a satellite device or a point of sale terminal, it must grant access to banks B, C and D, so long as these other banks pay the interchange fee. There is no discretion given to the establishing bank under subsection (a) of § 36a-156 as to the availability of these devices to other banks.

In contrast to subsection (a), however, subsection (b) of § 36a-156 applies only to nonsatellite devices, and gives banks discretion to make the device available to any other bank. Subsection (b) of § 36a-156 provides in relevant part: "Any bank . . . which has established an automated teller machine which is not a satellite device *may, in its discretion,* permit any other bank . . . to use such automated teller machine . . . *on a nondiscriminatory basis* . . . ." (Emphasis added.) To illustrate, if bank A establishes and operates a nonsatellite device, it is not required under § 36a-156 to provide any other bank with access to its nonsatellite device. If, however, bank A chooses to grant such access to bank B, it must then provide the same access to banks C and D, so long as banks B, C and D pay the interchange fee, as required by § 36a-156. Stated another way, the statute prohibits bank A from allying with bank B in order to form an exclusive ATM network, thereby excluding banks C and D. The contrast between subsections (a) and (b) of § 36a-156 is significant because it

highlights the statute's purpose in governing bank-to-bank relationships.

Although the establishing bank has discretion in one type of situation and not in the other, the common denominator is that access, once granted by the establishing bank to another bank, either voluntarily with regard to nonsatellite devices or by statutory mandate with regard to satellite devices and point of sale terminals, must be provided on a nondiscriminatory basis. The statute expressly envisions a type of ATM network in which an establishing bank makes available on a nondiscriminatory basis its ATM machines and point of sale terminals, "upon payment by each such other bank or credit union of a reasonably proportionate share of all acquisition, installation and operating costs . . . ." General Statutes § 36a-156 (a). The statutory language regarding the interchange fee provides the condition to the nondiscrimination requirement: availability of the banking devices must be made on a nondiscriminatory basis, so long as the card-issuing bank pays the interchange fee. This statutory language evinces a legislative intent to facilitate shared ATM networks and to prohibit exclusionary ATM networks.

Furthermore, the last sentence of subsection (a) of § 36a-156 supports the construction that the legislature intended to prevent banking configurations that would favor, or discriminate against, certain card-issuing banks. That provision provides: "The satellite device or point of sale terminal shall identify *with equal prominence* all of the banks, credit unions or network systems which use the satellite device or point of sale terminal." (Emphasis added.) General Statutes § 36a-156 (a). The statute, therefore, prohibits the establishing bank from creating a network that favors one member bank over another.

To summarize, we are presented with § 36a-156 entitled: "Availability of machines, devices and terminals

for use by other banks and credit unions." It recognizes three different types of banking devices—satellite devices, point of sale terminals and nonsatellite devices. It regulates two of these types of devices differently from the third type. In all situations where nondiscriminatory access is required, however, the statute permits the establishing bank to charge "a reasonably proportionate share of all acquisition, installation and operating costs . . . ." General Statutes § 36a-156 (a). Conspicuously absent from this statute is any language referring to fees or charges that may or may not be directly imposed on customers—either depositors or nondepositors of the establishing bank.

We next look to the statute's legislative history. There is nothing in the legislative history of Substitute Senate Bill No. 401, the bill eventually enacted as Public Acts 1975, No. 373, and codified as General Statutes §§ 36a-156 through 36a-159, to support the argument that § 36a-156 implicitly prohibits ATM nondepositor fees. To the contrary, the legislative history supports our conclusion that the enactment of this statutory scheme provided the framework in which state banks could establish ATMs and point of sale terminals. The legislative history also supports our construction that the discrimination addressed by the statute solely concerns the establishing bank's discrimination or selectivity among other banks.

The legislative history demonstrates that § 36a-156 was the state legislature's response to the grant of authority by the Federal Home Loan Bank Board and the Comptroller in December, 1974, to federal savings and loan associations and national banks to establish satellite devices and point of sale terminals. 18 H.R. Proc., Pt. 10, 1975 Sess., p. 4868; Conn. Joint Standing Committee Hearings, Banks, 1975 Sess., pp. 211, 214, 224, 237, 240, 244, 257. These national financial institutions could establish such devices without regard to

state bank branching laws because, according to the Comptroller, these devices were not "branches." Conn. Joint Standing Committee Hearings, supra, pp. 211, 214. In 1973, however, the state attorney general had opined that the commissioner lacked the authority to permit state banks to operate these devices. Id., pp. 212, 240. Without any action taken by the state legislature, therefore, state financial institutions would not have been able to offer the same services as their national counterparts.

Legislative committee hearings may be relevant to the meaning of statutes because they often demonstrate the problem or issue that the legislature sought to address by the statute. *Ferrigno* v. *Cromwell Development Associates*, 244 Conn. 189, 197, 708 A.2d 1371 (1998); *Mahoney* v. *Lensink*, 213 Conn. 548, 559–60, 569 A.2d 518 (1990). The hearings regarding the legislation eventually codified as §§ 36a-156 through 36a-159 indicate that the banking industry had two primary concerns: first, that state chartered banks did not have authority similar to federally chartered banks to establish satellite devices and point of sale terminals; and second, that smaller financial institutions would be excluded from ATM networks in the absence of mandatory sharing.

During the committee hearings, members of the banking industry acknowledged the disadvantage that state banks would encounter without the same ability as national institutions to establish these banking devices. For example, Elliott C. Miller, then senior vice president of Society for Savings, stated before the joint standing committee on banks: "[This bill] empowers state banking institutions to establish and use satellite devices and point-of-sale terminals." Conn. Joint Standing Committee Hearings, supra, p. 210. Miller, representing a state chartered financial institution, recognized the need for such legislation, pointing out that "federal reg-

ulatory agencies—the Federal Home Loan Bank Board and the [Comptroller]—have already started to authorize the use of these facilities by the federally chartered institutions under their respective jurisdictions." Id., p. 211. Miller further stated: "[W]e, the state chartered financial institutions, are asking, through this legislation, to be allowed to adapt to change along with our federally chartered sister institutions." Id., p. 213. Similarly, Stephen J. Sweeney, then assistant treasurer of the Naugatuck Savings Bank, made the following comments during the committee hearings: "[A]s you know there is presently legislation which would allow national banks to recognize satellite stations. In Naugatuck where there are two national banks, the competitive disadvantage for the Naugatuck Savings Bank would be a dimension the results of which would be disastrous for us." Id., pp. 224–25.

Not only do the committee hearings demonstrate the need to give state banks the authority to establish these banking devices, the hearings also demonstrate the purpose to prevent exclusionary ATM networks. For example, during the committee hearings, Stanley Spilecki, then chairman of the special committee on electronic funds transfer systems for the Savings Banks' Association of Connecticut, made the following statement: "Without shared satellite facilities only a few very large institutions would be able to set up a network of devices necessary to dominate the rapidly approaching era of electronic funds transfer systems. This is true now because only the large institutions have the research staff to find the best location for satellite facilities, the resources to purchase or control these locations, and the resources to put in place the expensive equipment and support them in a manner most likely for success." Id., p. 216. This statement recognizes that, because smaller banks may not have the resources necessary to establish and to operate ATMs and point of sale

terminals, they might otherwise be precluded from such ATM usage. Without a provision such as § 36a-156 providing for nondiscriminatory participation, larger financial institutions could ally with one another, form an ATM network, and deny participation to smaller institutions that could not provide ATM and point of sale services to their depositors on their own.

The floor debate also indicates that the legislature sought to ensure that state chartered banks would not be precluded from competing in this area. During one Senate debate, when Senator Richard C. Bozzuto was asked when outlying communities could expect ATM machines, he responded: "As of yet, the federal [government has] not allowed National Banks to avail themselves of this until July of 1975, so this Bill will coordinate with that privilege and I would say immediately thereafter . . . ." 18 S. Proc., Pt. 5, 1975 Sess., p. 2241. During the legislative debate in the House of Representatives, Representative Raymond C. Lyddy stated: "[The point of sale terminal] is a revolutionary device, but Federal Agencies have already authorized this and have begun using them under Federally chartered institutions that are under their jurisdiction. This [bill] allows our financial institutions in this State, to use these same facilities and thereby enable our banks to meet the competition that will be generated by the National banking institutions." 18 H.R. Proc., supra, p. 4868.

We are also mindful that the legislature and the banking industry, at the time of the enactment of § 36a-156, regarded this technology and the idea of mandatory shared networks as new and highly experimental. See, e.g., 18 S. Proc., supra, p. 2240, remarks of Senator Bozzuto ("the Bill will provide for a new technology within the Banking Industry"); 18 H.R. Proc., supra, p. 4868, remarks of Representative Lyddy ("[Substitute Senate Bill No. 401] represents a response to new tech-

nology in the banking industry"); Conn. Joint Standing Committee Hearings, supra, p. 249, remarks of Charles Lord, president of Hartford National Bank and Trust Company ("[mandatory sharing] is highly experimental"); id., pp. 210–12, remarks of Elliott C. Miller ("[s]atellite devices represent a significant technological development as part of the banking industry's efforts to furnish traditional banking services to customers in more convenient ways . . . this whole area will be largely experimental for awhile"). Such a backdrop cannot support a finding that the legislature regarded this legislation as comprehensive, as it related to ATM usage, nor that it foresaw the proliferation of such devices and fees, as the plaintiffs suggest. Rather, this historical context supports our conclusion that the legislature did not intend § 36a-156 to be an exhaustive list of fees that banks permissibly could impose in any ATM context.[11]

---

[11] The legislative history contains one ambiguous colloquy, which the plaintiffs argue illustrates the legislature's intent to protect consumers from fees. The following colloquy took place between Representatives Albert R. Webber and Lyddy during the legislative debate in the House of Representatives:

"[Representative Webber]: If one were to use this service at a super market, at the checkout counter, would that individual be charged a fee for the use of that service?

"The Deputy Speaker: The gentleman from the 126th if he cares to respond.

"[Representative Lyddy]: Through you Mr. Speaker. No.

"The Deputy Speaker: The gentleman from the 92nd.

"[Representative Webber]: If I understand the answer correctly, if a bank installs this very sophisticated piece of equipment in a super market for the convenience or at least to alleviate the problems at a checkout counter and the equipment, from what Mr. Lyddy tells us is costly, there shall be no charge and I ask the question again, to the customer who uses it?

"The Deputy Speaker: The gentleman from the 126th if you care to respond.

"[Representative Lyddy]: Through you Mr. Speaker. No charge." 18 H.R. Proc., supra, pp. 4870–71.

This colloquy does not alter our view of the statute. First, the discussion between Representatives Lyddy and Webber, which does not refer to any particular language in the bill, involved a point of sale terminal, not an ATM machine. We cannot infer from this single exchange that the legislature intended that customers, depositors and nondepositors alike, were to be afforded the same treatment when they used both the point of sale terminal

Finally, in interpreting the meaning of § 36a-156, we look to the relationship between the statute at issue and existing legislation regarding the same general subject matter. In 1975, the General Assembly enacted several statutes regarding the establishment and usage of ATMs and point of sale terminals. See General Statutes §§ 36a-155 through 36a-159. Nowhere in the language of any of these statutes does the legislature address fees *of any kind* that may be imposed on *customers*—depositors or nondepositors. In fact, the only mention of customers in this legislation appears in § 36a-155 (b), which confers, inter alia, power to the commissioner to adopt regulations regarding the safety of customers using these banking facilities.

We also look to the Deposit Account Contract Act; General Statutes §§ 36a-315 through 36a-323; for its treatment of ATM fees. First, that act is a disclosure statute that places several restrictions on the *manner* in which fees, or deposit account charges,[12] may be

and the ATM machine—at that time, new banking devices that served, and continue to serve, different banking functions. Second, it is unclear, when the two legislators referred to the customer at the checkout counter of a supermarket, whether that customer, who would not be charged a fee according to Representative Lyddy, was a depositor or a nondepositor of the bank that operates the device. This dialogue just as easily could be construed, or misconstrued, to prohibit surcharges to all customers, depositors and nondepositors, for any ATM or point of sale terminal transaction. The plaintiffs concede, however, that ATM depositor fees are permissible. Third, this colloquy alone cannot overcome a contrary construction, which *is* supported by the statutory language, other legislative history, and the legislature's purpose in enacting the statute.

[12] General Statutes § 36a-316 (6) defines deposit account charge as "a charge which may be imposed on a depositor for utilizing the services of a financial institution in connection with a deposit account, including a charge for: (A) Stop payment orders; (B) items drawn on a deposit account which are dishonored; (C) providing the depositor with a copy of any record relating to a deposit account; (D) the use of checks, negotiable orders of withdrawal, share drafts or other items, devices or methods that may be used to withdraw moneys from a deposit account; and (E) maintaining a deposit account, such as a service charge."

imposed on depositors. For example, General Statutes § 36a-317 (b) provides in relevant part: "No financial institution shall impose or attempt to impose any deposit account charge that has not been disclosed to the depositor pursuant to section 36a-318 or 36a-320, as applicable, or is in an amount greater than the amount disclosed to the depositor pursuant to section 36a-318 or 36a-320, as applicable. . . ." Similarly, General Statutes § 36a-320 (a)[13] specifies other notice requirements to which a bank must adhere in order to impose deposit account charges on depositors. Nowhere in the act, however, does the legislature expressly grant or deny authority to the banks to charge ATM depositor fees. That act, therefore, assumes that the authority to impose fees does exist.

Additionally, General Statutes § 36a-250 supports our conclusion that § 36a-156 does not address customer fees in any way, either directly, or by negative implication. Pursuant to § 36a-250, which provides an extensive list of the express powers of state banks, banks may: act as depositories of court and trust funds; General Statutes § 36a-250 (3); act as transfer agents or registrars of stocks and bonds; General Statutes § 36a-250

---

[13] General Statutes § 36a-320 (a) provides: "A financial institution may delete or decrease any existing deposit account charges without notice. No financial institution shall impose any new deposit account charge or increase any existing deposit account charge unless the financial institution: (1) At least thirty days prior to such imposition or increase, posts a notice reciting such new or increased charge adjacent to, or incorporates such notice in, the current deposit account charges posted in each office at which deposits are accepted; and (2) delivers a notice reciting such new or increased charge to each depositor who has a deposit account which will be affected by such new or increased charge and for which such financial institution normally renders a periodic statement of account, which notice of new or increased charge shall be delivered (A) at least thirty days prior to such new or increased charge if any such periodic statement is normally rendered monthly or more frequently, or (B) no later than delivery of the next subsequent periodic statement after such new or increased charge if any such periodic statement is normally rendered less frequently than monthly."

(9); establish charitable funds; General Statutes § 36a-250 (17); and provide home banking services to customers. General Statutes § 36a-250 (23). Although this statute, which provides a thirty-nine item list of banks' express powers, does not expressly provide for the imposition of ATM depositor fees, the plaintiffs concede that the banks have such power. It would be anomalous to conclude, in light of the Deposit Account Contract Act and § 36a-250, that § 36a-156 prohibits ATM nondepositor fees.

The plaintiffs argue that the reference in § 36a-156 to the nondiscriminatory imposition of the interchange fee means that the legislature implicitly meant to prohibit the imposition of the nondepositor fees. Thus, the plaintiffs' argument rests on the axiom "expressio unius est exclusio alterius," translated from the Latin to mean, "the expression of one thing is the exclusion of another." Although the so-called canons of statutory construction may at times serve as useful tools in deciphering legislative meaning, to rely on any one of them as a compelling factor in the interpretive process is problematic, because as Professor Karl Llewellyn persuasively has demonstrated, "there are two opposing canons on almost every point." K. Llewellyn, "Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to Be Construed," 3 Vand. L. Rev. 395, 401 (1950). The so-called "canons" are not that, at least in the sense that any one of them reliably can be determined to apply or not to apply in any given case. They are, instead, merely guides drawn from experience, to be employed or not to be employed carefully and judiciously, depending on the circumstances. See F. Frankfurter, "Some Reflections on the Reading of Statutes," 47 Colum. L. Rev. 527, 544–45 (1947); see also *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 455, 692 A.2d 742 (1997). "To permit them to displace the conclusions that careful interpretation

yields . . . would be a disservice to the legislative process, as well as to the judicial exercise of interpreting legislative language based upon the premise that the legislature intends to enact reasonable public policies." *United Illuminating Co.* v. *New Haven,* supra, 455.

Although we have at times interpreted certain statutory provisions as demonstrating a legislative intent to exclude, by implication, other possible referents; see, e.g., *State* v. *Kish,* 186 Conn. 757, 766, 443 A.2d 1274 (1982) (statutory itemization demonstrates legislative intent to exclude unenumerated items); we decline to do so where there is no language, legislative history or statutory purpose suggesting that we reach such a result. See *Williams Ford, Inc.* v. *Hartford Courant Co.,* 232 Conn. 559, 584–85, 657 A.2d 212 (1995); *Fahy* v. *Fahy,* 227 Conn. 505, 513, 630 A.2d 1328 (1993)°.

Furthermore, the plaintiffs' reliance on the negative implication purportedly created by the statute's reference to the interchange fee is inherently inconsistent. They specifically concede that the statute does not prohibit depositor fees. It is difficult to understand how the purported negative implication could prohibit one type of customer fee but not another.

The plaintiffs also misconstrue the phrase, "on a non-discriminatory basis," which is contained in § 36a-156, as it relates to the availability of ATMs. They argue that the discrimination that is prohibited by § 36a-156 occurs when the establishing bank charges an ATM nondepositor fee. The discrimination that the statute proscribes, however, is discriminatory conduct by the establishing bank with respect to other banks. The statute does not mention, either explicitly or implicitly, differentiation of fees among various categories of customers.

The plaintiffs also argue that the Deposit Account Contract Act supports their position that nondepositor fees statutorily are prohibited. They contend that,

although § 36a-156 permits an interchange fee, thereby implicitly prohibiting all other ATM fees, the Deposit Account Contract Act provides an implicit exception to the otherwise general prohibition of § 36a-156 against ATM fees being charged to customers, and permits banks to charge only ATM depositor fees, i.e., fees charged to the bank's own depositors. Thus, the plaintiffs argue that that act implicitly confers authority on the banks to impose ATM depositor fees. For this proposition they rely on the definitional section of the Deposit Account Contract Act, specifically, § 36a-316 (6), which defines deposit account charge.[14] As explained previously, however, that act does not grant any authority to banks to charge depositor fees; it merely assumes that such authority exists, to be employed or not as a business decision by the banks.

The plaintiffs also attempt to import into § 36a-156 a consumer protection or antitrust focus that neither the statute's language, history nor background plausibly will bear. To that end, the plaintiffs refer to the defendants' imposition of ATM nondepositor fees as "the latest salvo in the current fee war being waged by large banks against the public's access to its funds and against smaller banks." The plaintiffs contend, in essence, that the legislature foresaw undue market dominance by large banks as a result of ATMs. Their reading ignores the purposes that the legislature did have in enacting this legislation: to allow state financial institutions to participate in this new technology; and to prevent exclusionary ATM networks. There is nothing in the statute's language, history or background that supports the plaintiffs' contentions.

Those contentions, moreover, are inconsistent with the undisputed facts that, when this legislation was enacted in 1975, the entire area of the use of ATMs was

---

[14] See footnote 12 of this opinion.

experimental and untested in the marketplace, and that the legislature regarded it as such. No one, including our legislature, could have foreseen at that time what the economic and competitive effects of ATMs would be. Indeed, as the defendants point out, the marketplace already has begun to respond to the purported dominance by large banks.[15] If there is to be state regulation of ATM customer fees, that is a policy matter for the determination by the legislature based on current economic and other relevant data. It simply is not, as the plaintiffs suggest, a question that was implicitly resolved in 1975.

We answer the reserved question in the negative. The case is remanded for further proceedings according to law.

No costs will be taxed in this court to any party.

In this opinion NORCOTT, KATZ, PALMER and CALLAHAN, Js., concurred.

BERDON, J., with whom LAVERY, J., joins, dissenting. Putting aside the majority's rhetoric, the court's decision today, favoring the state's largest and most powerful banks at the expense of the consumer and smaller banks, construes General Statutes § 36a-156 in such a manner that authorizes the banks to charge the nondepositor a fee for using their automated teller machines (ATM). Superficially, it may seem reasonable to allow a bank who owns an ATM to charge the customer of another bank a fee for its use. If there was

---

[15] The defendants bring to our attention the fact that smaller banks have responded by forming ATM networks that prohibit the imposition of convenience fees. For example, the record reveals that in 1988, the then banking commissioner, Howard B. Brown, disclosed that an ATM network composed of smaller banks prohibited member banks from charging such fees. Depositors of smaller banks that are members of such a network, therefore, presumably have ATMs available to them without being subject to convenience fees and, accordingly, those banks may exploit that availability as a competitive response to the ATM networks of the larger banks.

no more, I would not be dissenting; but this is far from the end of the story.

## I

The ATM must first be put in its proper perspective. These unattended electronic devices allows the consumer to conduct banking transactions—such as obtaining cash withdrawals, making deposits, transferring funds between accounts, obtaining balances—all without a bank teller. The ATMs of all the banks are connected through shared networks.[1] In other words, a customer of bank A can access his account through bank B, even though he is not a customer there. The ATM has become the primary means for the poor—indeed, not only the poor but also the average consumer—to fulfill their banking needs without being restricted by long lines and banker's hours. It is not uncommon for a bank to have an ATM at a supermarket or other commercial establishment for the convenience of the consumer.

The impact of these fees—which have in the past ranged between $0.50 to $2.50 per transaction, with the common surcharge of $1.50—is the hardest on the poor. The working poor find it virtually impossible to do their banking during the hours when the banks are open but must rely on the ATM. Those that are recipients of state assistance receive their benefits through electronic benefit trust (benefit trust) or electronic fund transfer (direct deposit). Although the poor do not now pay a service fee for accessing their benefits electronically through the ATMs, that is based upon the interpretation of § 36a-156 by the plaintiff, John P. Burke, the commissioner of banking for the state (commissioner), that

---

[1] The ATMs are connected through shared networks such as CIRRUS, PLUS and NYCE.

prohibits the charging of fees to nondepositors,[2] which is the issue presented in this case. With the majority's decision today, it opens the door for the banking industry to take advantage of the poor.[3]

The amicus curiae Greater Hartford Legal Assistance points out in its brief the following: According to statistics from the department of social services, "the average monthly [temporary family assistance program][4] public benefit distribution to a family of three in the state of

---

[2] Receipt of cash assistance in Connecticut is now required to be delivered via benefit trust or direct deposit in accordance with the statutorily mandated statewide fraud detection system for the department of social services. See General Statutes §§ 17b-2 and 17b-7a. Through benefit trust systems, benefits are made available electronically to recipients who do not have bank accounts through the use of a coded card that works similar to an ATM card. In 1996, the state negotiated a contract for its benefit trust services with Citigroup, Inc. Individuals who receive benefits through benefit trust access their cash at an ATM or at a point of sale terminal at a retail location. Currently, however, unlike direct deposit recipients who pay their banks' standard fees for their accounts, benefit trust recipients can access their funds at an ATM four times a month at no charge and $0.85 for all subsequent transactions. According to Robert O'Connor, director of management information systems at the department of social services, this arrangement for benefit trust services for public benefits recipients who otherwise would be unable to obtain bank accounts, was based upon the commissioner's interpretation of § 36a-156, prohibiting ATM surcharge fees. Based on the majority's ruling today, those receiving public assistance in this state who rely on the benefit trust service will no longer have this service available to them.

[3] The low income population in Connecticut is disproportionately high. The cities of Hartford and New Haven have some of the highest poverty rates for northeastern cities. The United States Department of Housing and Urban Development estimated that as of 1995 Hartford's poverty rate was 35.2 percent while New Haven's was 26.4 percent. Indeed, according to the United States Census Bureau, in a state with the highest per capita income in the country, over 10 percent of our citizens are living below the poverty level. Over 83,000 households receive food stamps and approximately 56,193 households receive cash benefits. Of these households, 9740 are currently receiving their benefits through direct deposit and 36,282 are receiving their benefits through benefit trust.

[4] The temporary family assistance program is the public cash benefits program for low income persons administered through the department of social services.

Connecticut is $572. A family receiving this monthly benefit lives on an amount which is less than one half of the federal poverty level. ATM withdrawal surcharges would clearly have an impact on the monthly budget of such families. If each transaction at an ATM carried with it a surcharge, in addition to the fees that benefit trust recipients and other low-income banking customers are paying, low-income people would be sacrificing an additional amount of money that is sorely needed to survive. Further, if a person of low-income needs to withdraw, or desires to withdraw, only $20 or $30 at a time at an ATM, she could be paying a 5 to 10 [percent] surcharge for each transaction, which would have an enormous impact on her budget. Low-income persons should not be forced to carry with them large amounts of cash at one time in order to avoid a surcharge."

The problem does not stop there—allowance of those charges would be harmful to the public welfare. The commissioner made specific findings as to the harm that would occur to the public and to the competitiveness of the banking industry in Connecticut. In an action brought by two of the three defendants in the present case, Fleet National Bank (Fleet) and First Union National Bank,[5] against the commissioner, seeking to enjoin the commissioner from enforcing a cease and desist order he issued prohibiting the ATM surcharge fees for nondepositors, the trial court stated: "The commissioner found that the public welfare requires immediate action. This finding is based on the financial costs to the public of the plaintiffs' proposed surcharges, which, when aggregated, amount to a total of approximately $25,000 per day. As the plaintiffs control more than 30 percent of the ATMs in the state, this would constitute a significant financial drain on the public.

---

[5] It was recently announced that the third defendant, Bank of Boston, will merge with Fleet, a move that will serve only to further stifle competition for smaller banks.

Moreover, the commissioner determined that [Fleet] advised ATM users (while Fleet was imposing surcharges) that nondepositor customers could avoid the same by becoming Fleet depositors. The commissioner concluded that this was anticompetitive and could put pressure on users to become Fleet depositors to the detriment of banks with smaller ATM networks. The commissioner also concluded that given the concentration of ownership of ATMs by the plaintiffs, the ability of Connecticut consumers to use nonsurcharging ATMs could be severely limited." *Fleet National Bank* v. *Burke*, 45 Conn. Sup. 566, 578, 727 A.2d 823 (1998).

## II

The sole issue before this court is: Does § 36a-156 prohibit a bank that owns an ATM from charging a fee to a nondepositor who uses the bank's machine?[6] It is fundamental that statutory construction requires the ascertainment of the legislative intent. In seeking to determine the legislature's intent when it adopted § 36a-156, we "look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . No one invariable rule of statutory construction is controlling." (Citation omitted; internal quotation marks omitted.) *Carpenteri-Waddington, Inc.* v. *Commissioner of Revenue Services*, 231 Conn. 355, 362, 650 A.2d 147 (1994).

## A

I first focus on the language of § 36a-156. The statute provides: "Availability of machines, devices and terminals for use by other banks and credit unions. (a) One

---

[6] In order to simplify this dissent, I refer only to banks. Section 36a-156 also has application to credit unions.

or more banks, Connecticut credit unions or federal credit unions which have established a satellite device or point of sale terminal shall make the satellite device or point of sale terminal available on a nondiscriminatory basis for use by any other bank, Connecticut credit union or federal credit union, upon payment by each such other bank or credit union of a reasonably proportionate share of all acquisition, installation and operating costs of the satellite device or point of sale terminal. The satellite device or point of sale terminal shall identify with equal prominence all of the banks, credit unions or network systems which use the satellite device or point of sale terminal.

"(b) Any bank, Connecticut credit union or federal credit union which has established an automated teller machine which is not a satellite device may, in its discretion, permit any other bank, Connecticut credit union or federal credit union to use such automated teller machine, provided, (1) if such permission is granted to any other bank, Connecticut credit union or federal credit union, the automated teller machine is made available on a nondiscriminatory basis for use by any other bank, Connecticut credit union or federal credit union, upon payment of reasonably proportionate costs as described under subsection (a) of this section, and (2) such use is otherwise in accordance with subsection (a) of this section." General Statutes § 36a-156.

In common parlance, the applicable provisions of the statute with respect to the issue in this case clearly and specifically provide that (1) if a bank establishes a satellite ATM—that is, an ATM off its premises—it must make that ATM available to the customers of all other banks upon payment of an interchange fee[7] by the

---

[7] An interchange fee is defined as a "reasonably proportionate share of all acquisition, installation and operating costs of the [ATM] or point of sale terminal." General Statutes § 36a-156 (a).

nondepositor's bank and (2) that if a bank establishes an ATM which is not a satellite—in other words, an ATM located on the premises of the bank—and it permits the customers of any other bank to use the ATM, it must be made available on a nondiscriminatory basis for use by the customer of all other banks upon payment of an interchange fee by the nondepositor's bank.

As a result of § 36a-156, which specifically allows a bank that owns an ATM to charge another bank a specific fee when that bank's customers use the ATM—that is, the interchange fee—a well established rule of statutory construction *prohibits* the charging of any other fee for the use of the ATM by a nondepositor. This rule—"expressio unius est exclusio alterius" or "the expression of one thing is the exclusion of another"; Black's Law Dictionary (6th Ed. 1990); has been firmly implanted in this state's jurisprudence and employed continuously for more than one hundred years. See *Coletti* v. *Connecticut Co.*, 105 Conn. 94, 96, 134 A. 248 (1926); *State ex rel. Morris* v. *Bulkeley*, 61 Conn. 287, 367, 23 A. 186 (1892). Simply put, a "statute which provides that a thing be done in a certain way carries with it an implied prohibition against doing that thing in any other way." (Internal quotation marks omitted.) *Chairman, Criminal Justice Commission* v. *Freedom of Information Commission*, 217 Conn. 193, 200, 585 A.2d 96 (1991). Accordingly, since § 36a-156 provides that the bank who owns the ATM must make it available upon the payment of an interchange fee by the nondepositor's bank, it is implied that if the legislature intended to allow the ATM bank to also charge a user's fee to a nondepositor it would have specifically provided for it.

There is another rule of statutory construction that reinforces the conclusion that the legislature never intended to allow the ATM bank to charge nondepositors a user's fee. On November 20, 1998, as previously

indicated, two of the three defendants in the present case brought an action to enjoin the commissioner from enforcing his cease and desist order prohibiting them from charging nondepositors the ATM surcharge fee. The trial court denied the defendants' application for a temporary injunction. See *Fleet National Bank* v. *Burke,* supra, 45 Conn. Sup. 580. The trial court's well reasoned published opinion posited that, "§ 36a-156 already provides for payment of 'acquisition, installation and operating costs,' the legal presumption is that the legislature did not intend to include other charges. Had the legislature wanted to do so, it could have included such a provision." Id., 575.

"[T]he legislature is presumed to be aware of the judicial construction placed upon its enactments." *Lumbermens Mutual Casualty Co.* v. *Huntley,* 223 Conn. 22, 30, 610 A.2d 1292 (1992). The legislature, having been in session since *Fleet National Bank* was decided, could have amended § 36a-156 if they had disagreed with that judicial construction of the statute by specifically authorizing the ATM fee for nondepositors. It did not do so. Accordingly, there is "nothing to support the claim that the legislature intended a contrary construction of the statute." Id.

### B

I must confess that the majority opinion confuses me with respect to the legislative history cited therein. The majority discounts as "ambiguous" the only genuinely relevant legislative history of Public Acts 1975, No. 75-373, which was codified as General Statutes §§ 36a-156 through 36a-159. That legislative history is revealing, although it had specific reference to the point of sale terminal, the ATM utilized in retail outlets. The debate on the floor of the House of Representatives with respect to Public Act 75-373 included the following:

"[Representative Albert R. Webber, cochairperson of the legislative committee on general law]: Thank you. If one were to use this service at a supermarket, at the check-out counter, would that individual be charged a fee for the use of that service? . . .

"[Representative Raymond C. Lyddy, cochairperson of the legislative committee on banks]: . . . No. . . .

"[Representative Webber]: If I understand the answer correctly, if a bank installs this very sophisticated piece of equipment in a supermarket for the convenience or at least to alleviate the problems at a check-out counter and the equipment, from what Mr. Lyddy tells us is costly, there shall be no charge and I ask the question again, to the customer who uses it?

"[Representative Lyddy]: . . . *No charge.*" (Emphasis added.) 18 H.R. Proc., Pt. 10, 1975 Sess., pp. 4870–71.

It is obvious Representative Webber's reference to a supermarket checkout counter was merely an example. It does not make sense to limit his inquiry about fees to that one type of transaction, that is, the point of sale; it is obvious that he was concerned about charges to nondepositors for the entire ATM system.

"Although statements made on the floor of the legislature are not controlling on statutory interpretation, we may take judicial notice of those statements, which are strong indications of legislative intent. *American Universal Ins. Co.* v. *DelGreco,* 205 Conn. 178, 195 n.8, 530 A.2d 171 (1987); *Manchester Sand & Gravel Co.* v. *South Windsor,* 203 Conn. 267, 276, 524 A.2d 621 (1987); *Verrastro* v. *Sivertsen,* [188 Conn. 213, 223 n.9, 448 A.2d 1344 (1982)]." *Winchester Woods Associates* v. *Planning & Zoning Commission,* 219 Conn. 303, 310–11, 592 A.2d 953 (1991).

Furthermore, as the majority concedes, the legislative history indicates that there was a concern "that smaller

financial institutions would be excluded from ATM networks in the absence of mandatory sharing." To be concerned about the exclusion of the customers of smaller banks and not be concerned about the charges with respect to those customers is incongruous. The fees would simply drive the consumer to the ATM of a bank that does not charge them. See Barkley, Clark, Shook, Hardy & Bacon, LLP, "ATM Surcharges: Here Today, Gone Tomorrow?" 5 Clarks' Bank Deposits and Payments Monthly 1, 3 (February 1997).[8] On the other hand, limiting the servicing bank to recouping the costs by charging the noncustomer banks an interchange fee is "designed to increase economic efficiency and render markets more, rather than less, competitive." *Southtrust Corp.* v. *Plus System, Inc.*, 913 F. Sup. 1517, 1523 (N.D. Ala. 1995).

---

[8] "Since banks began offering ATM services, ATM access has become an important selling point banks use to distinguish their deposit services from their competitors. Before the surcharge fee, the price of ATM services among competing institutions remained relatively stagnant. In an effort to maintain or even improve market share, banks generally offered competitive ATM service charges. The surcharge fee may change this pricing environment and have the unwelcome effect of driving the small bank depositor to the larger banks. Because the surcharge is levied by the ATM owner directly against the use, there is relatively little incentive to keep the surcharge low. Therefore, a bank that has the largest market share of deployed ATMs may effectively entice its competitors' depositors to switch banks merely by imposing a high surcharge. Tired of paying the surcharge fee at the most-frequented ATMs, these users may switch banks because generally the ATM owner will not levy a surcharge on its own customers. *Thus it appears that the bank with the most ATMs may increase its market share by raising prices!*

"*The effect on smaller local banks could be devastating.* Unable to deploy numerous ATMs because of the costs involved, smaller banks have relied on the shared network to give their depositors equal access to the same ATMs that the larger banks provided their customers. To remain competitive, many of these smaller institutions offered their ATM services free or at prices substantially below their larger competitors. The surcharge fee changes the ability of the small/local bank to effectively offer free or low-cost ATM services. Again, tired of paying these surcharge fees, the small bank depositor may switch institutions in an effort to maintain the same ATM service without the added surcharge fee." (Emphasis added.) Barkley, Clark, Shook, Hardy & Bacon, LLP, supra, 5 Clarks' Bank Deposits and Payments Monthly 3.

## C

Finally, the majority's standard of review that gives no deference is due to the commissioner's view that § 36a-156 prohibits banks from charging nondepositors ATM user fees is baffling. Since at least September 14, 1995, the commissioner construed § 36a-156 to prohibit charges to customers of other banks.[9] Since that date

---

[9] This construction of § 36a-156 was evidenced in a letter from the commissioner to Fleet's counsel dated September 14, 1995, which provided: "This is in response to your letter dated August 1, 1995, concerning the permissibility of certain automated teller machine ('ATM') transaction fees. Specifically, you seek confirmation of your interpretation that a state-chartered bank permissibly may charge a direct transaction fee for the use of such bank's ATM by a person who does not otherwise maintain a banking relationship with the bank. The imposition of such transaction fees would permit a bank to recoup a portion of the expenses incurred by the bank to establish and maintain the ATM. You also seek the concurrence of this department that the Connecticut statutes governing the use of ATMs in Connecticut would not place any restriction on the ability of a federally-chartered bank in Connecticut to impose similar fees, provided it was authorized to do so under federal law. You state that any such transaction fees to be imposed would be disclosed to the user of the ATM either on a sign posted on the ATM or in clear view of the customer using the ATM or electronically during the course of the transaction in a manner that would permit a user to cancel the transaction without incurring the transaction fee.

"The Connecticut statutes governing the establishment and use of ATMs do not authorize banks to impose the transaction fees described above. Moreover, [§] 36a-156 . . . specifically authorizes a bank that has established an ATM to impose a usage fee on other banks whose customers use the ATM to cover 'a reasonably proportionate share of all acquisition, installation and operating costs.' It is an established rule of statutory construction that a statute which provides that a thing shall be done in a certain way carries with it an implied prohibition against doing that thing in another way. See, State ex rel. Barlow v. Kaminsky, 144 Conn. 612 [620, 136 A.2d 792] (1957). Therefore, [§] 36a-156, which provides that a bank may charge another bank that uses its ATM a fee for such use, carries with it an implied prohibition against the bank imposing a fee on the customers of the other bank for such use. Accordingly, this department is unable to agree with your interpretation that a state-chartered bank in Connecticut may charge a direct transaction fee for the use of its ATM by the customer of another bank or that the Connecticut statutes governing ATMs would not restrict the ability of federally-chartered banks in Connecticut to impose similar fees. A state-chartered or federally-chartered bank in Connecticut that wishes to recoup the expenses incurred in establishing and maintaining an ATM may

there has been four legislative sessions and the legislature has failed to amend § 36a-156.

This construction by the commissioner invokes principles to which this court has always adhered—at least in those instances where it comports with the direction in which the majority wishes to travel. First, as Justice Katz writing for a unanimous court pointed out: "Although the interpretation of statutes is ultimately a question of law . . . it is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement." (Internal quotation marks omitted.) *State Board of Labor Relations* v. *Freedom of Information Commission*, 244 Conn. 487, 494, 709 A.2d 1129 (1998). Simply put, the "time-tested agency interpretations" must stand. *New Haven* v. *Freedom of Information Commission*, 205 Conn. 767, 774, 523 A.2d 1297 (1988). Second, we should presume that the legislature is aware of the executive branch's written interpretation of those statutes that come within its domain. See, e.g., *Lumbermens Mutual Casualty Co.* v. *Huntley*, supra, 223 Conn. 30 and n.11. The failure of the legislature to amend § 36a-156 in light of the commissioner's long-standing interpretation of the statute is illuminating. The majority simply ignores these fundamental principles of administrative law.

### III

The majority's decision today will have the greatest impact on those who can least afford it and have the least power to redress it. This decision renders the poor of this state captive to a growing banking monopoly and will broaden the ever widening gap between the rich and the poor. It will stifle banking competition at the expense of both the poor and smaller banks, and

do so by imposing the usage fee permitted under [§] 36a-156 on other banks whose customers use the ATM."

will ultimately sacrifice Connecticut's overall economic well-being and stability for the benefit of the few.

Accordingly, I dissent.